W. R. BINGAMAN et al., Appellants, v. J. M. HANNAH et al.

Division Two, April 10, 1917.

1. **WILL CONTEST:** Testamentary Capacity. Where if the contestants' evidence is to be believed the testator was without sufficient mind to make a will, and if the evidence for proponents is to be believed he had mind sufficient to make a will, the question of his testamentary capacity is one of fact to be decided by the jury.

2. —————: **Due Execution of Will: Knowledge of Contents.** Where there is substantial evidence that testator was possessed of testamentary capacity and the uncontradicted evidence is that the will was read aloud to him, the proper conclusion is that he knew its contents before he affixed his mark to it.

3. —————: —————: **Witnessing: At Request of Testator.** The statute does not require that the testator shall verbally request the subscribing witnesses to attest his will, and the will cannot be destroyed on the sole ground that he did not himself make such request. If after the will was read aloud to testator and he had announced his assent thereto and had affixed his mark to it, the scrivener, in

his presence and hearing, requested two competent persons to subscribe their names as witnesses, and they did so in testator's presence, the attestation met the requirements of the statute.

4. **MOTION TO STRIKE OUT ANSWER: No Exception.** An assignment that the trial court erred in overruling contestants' motion to strike out proponents' amended answer on the ground that it contradicted the original answer, cannot be reviewed on appeal unless an exception was saved to the ruling and the exception and the motion itself were preserved in a bill of exceptions.

5. **WITNESS: Ruling of Incompetency: No Offer of Testimony.** The ruling of the trial court that a certain witness offered by appellants was incompetent to testify will not be reviewed on appeal unless the ruling was followed by an offer to prove what the witness's testimony would be if he were permitted to testify.

6. **WILL CONTEST:    Subscribing Witnesses:    Cross-Examination.** Where the subscribing witnesses manifest an unwillingness to testify to the mental condition of the testator at the time he subscribed the will, the trial court does not abuse its discretion by permitting proponents to cross-examine them, though their own witnesses, by asking them if they had not sworn in the probate court, upon the original probate of the will, that testator was of sound mind at the time he signed the will.

7. ———:    Subscribing Witnesses: Instructions: Knowledge of Testator:    Presence. The instructions should clearly convey to the jury the idea that in order to find that the will was properly witnessed they should find that it was signed by subscribing witnesses in the presence of the testator and with his knowledge and consent. The word "presence" necessarily includes knowledge of the act and acquiescence therein by the testator, and they can be shown in different ways, namely, by his verbal request, or by any act or conduct upon his part, or by any other evidence which would show that he had knowledge of the attestation and consented to or acquiesced therein.

Appeal from Wright Circuit Court.—*Hon. C. H. Skinker,* Judge.

AFFIRMED.

*J. N. Burroughs* for appellants.

(1) Where there is no evidence tending to show that the testatrix had any knowledge of the contents of the will as drawn, and where it does not dispose of her property as she had desired and had directed, it will be

held that it was not the will of the testatrix. Bradford v. Blossom, 207 Mo. 207. (2) The burden is on the proponents to prove the due execution of the will and that the testator had mental capacity to know and understand what he was doing. That burden they must assume, even though contestants introduced no evidence. Cowan v. Shaver, 197 Mo. 203. (3) The provision of the statute which requires that every will shall be signed by the testator or by some person by his direction is. mandatory; and if it is not complied with, the will is void. Hospital Assn. v. Williams, 19 Mo. 609; Simpson v. Simpson, 27 Mo. 288; Elliott v. Welby, 13 Mo. App. 19; Catlett v. Catlett, 55 Mo. 330; Walton v. Kendrick, 122 Mo. 504. (4) In order to make a will valid the witnesses must sign the instrument by request of the, testator. Miltenberger v. Miltenberger, 78 Mo. 27; Elliott v. Welby, 13 Mo. App. 19. (5) Upon the issue of *devisavit vel non,* the court should take the proof and establish or reject the will. McMahon v. McMahon, 100 Mo. 99; Benoist v. Murrin, 48 Mo. 48; Jackson v. Hardin, 83 Mo. 184; Hughes v. Burriss, 85 Mo. 665; Bradford v. Blossom, 207 Mo. 228. (6) The motion of plaintiffs to strike out the amended answer of defendants was well taken and should have been sustained. The amended answer was directly and absolutely contradictory of the original answer. It was a stultification of defendants and is not permitted under the law. An admission contained in a pleading is conclusive on the pleader. Kessner v. Phillips, 189 Mo. 528. Where the answer contains a general denial, there can be no implied admission of any fact stated in the petition. State to use v. Samuels, 28 Mo. App. 649. (7) Husband of a wife interested in setting aside a will is a competent witness in the cause. Roberts v. Bartlett, 190 Mo. 703. (8) It was error to permit defendants to ask the subscribing witnesses whether they had not sworn in the probate court that the deceased was of sound mind. It was also error for the court to refuse the instruction excluding evidence of the probating of the claimed will.

*Green, Wayland & Green* for respondents.

(1)   The influence of a wife or child upon a testator will not avoid the will, if the influence is exercised or exerted in a reasonable manner without fraud or deception.   Crowson v. Crowson, 172 Mo. 691; Thompson v. Ish, 99 Mo. 160;   Maddox v. Maddox, 114 Mo. 35; Bonsal v. Randall, 192 Mo. 525; Seibert v. Hatcher, 205 Mo. 97.   This testimony of the declarations of the testator was proper, for the reason that it showed a fixed and definite purpose of long standing on part of the testator to give his wife the property in controversy.   Jones v. Thomas, 218 Mo. 508.   (2) Instructions numbered 4 and 11, complained of as error by plaintiff, were authorized by Seibert v. Hatcher, 205 Mo. 97, and Hughes v. Rader, 183 Mo. 630.   (3) The court did not err in overruling plaintiff's motion to strike out amended answer of defendants, and if error, it would warrant a judgment for plaintiffs, or a reversal for a new trial.   Under the general denial the affirmative of every allegation of the petition (except as to whether or not the writing in question was in fact the decedent's last will and testament, the execution of same and the mental capacity of the testator at the time of its execution), would have rested upon the plaintiffs.   Bradford v. Blossom, 207 Mo. 177; Harris v. Hays, 53 Mo. 90; Sehr v. Lindemann, 153 Mo. 276; McFaddin v. Catron, 120 Mo. 252; Cowen v. Shaver, 197 Mo. 203.   Every issue in this case could have been tried under the general denial.   A majority of will contests are tried on answers of general denial.   Hogan v. Kinchey, 195 Mo. 530.   "Amendments are favored and should be liberally allowed in favor of justice." House v. Duncan, 50 Mo. 453; Carr v. Moss, 87 Mo. 447. "The discretion of the trial court will not be interfered with on appeal unless it is manifest that it has been abused." Carr v. Moss, supra. (4) Under Sec. 6354, R. S. 1909, it is held that "If the wife (or husband) is a party to the suit and has a real interest in the subject which would be affected by the judgment, then she (or he) is a competent witness." Layson v. Cooper, 174

Mo. 223; Dunifer v. Jecko, 87 Mo. 285; Stefen v. Bauer, 70 Mo. 399; Wood v. Bradley, 76 Mo. 33; Bell v. Railroad, 86 Mo. 73; O'Brien v. Allen, 95 Mo. 73. To qualify either to testify, he or she must be not only a party in the suit, but must have a real interest in the subject which would be affected by the judgment. Fugate v. Pierce, 49 Mo. 441; Hariman v. Stowe, 57 Mo. 93; Scrutchfield v. Santer, 119 Mo. 615. (5) Testator had sufficient mental capacity to make the will. Sehr v. Lendemann, 153 Mo. 288; Hamon v. Hamon, 180 Mo. 701; Holton v. Cochran, 208 Mo. 314; Riggin v. College, 160 Mo. 570; Weston v. Hanson, 212 Mo. 248; Hughes v. Rader, 183 Mo. 63. (6) The will was properly executed. "The mere fact that one of the beneficiaries, who drew the will, requested the attendance of the witnesses, and the fact that testatrix does not proclaim the paper to be her last will and testament, nor verbally request the witnesses to attest it, are not sufficient to annul the will on the ground of non-compliance with the statute." Hughes v. Rader, 183 Mo. 630; Lindsey v. Stephens, 229 Mo. 615.

WILLIAMS, J.—This is a suit to contest the alleged will of Henry H. Bingaman, deceased. By the alleged will said Bingaman (for brevity we will hereinafter refer to him as the testator) devised and bequeathed practically all of his property consisting of sixty acres of land and about four hundred dollars worth of personal property, to his wife Belle Bingaman. Testator died on the 29th day of June, 1909, and left no children surviving him. Testator's wife died in 1911, and shortly afterwards this suit was instituted by the heirs of the testator against the defendants who are the heirs of Belle Bingaman. Trial was had before a jury, in the circuit court of Howell County, which resulted in a verdict and judgment establishing the will. Thereupon plaintiffs duly perfected an appeal.

The appeal was first taken to the Springfield Court of Appeals, but that court, on the theory that the title to real estate was involved, certified the case here.

The evidence upon the part of the defendants tends to establish the following facts:

On the 25th day of June, 1909, the day the will was written, testator's brother, William Bingaman, informed C. H. Cobb, a lawyer and notary public, that he was wanted at the testator's home to prepare a will. Mr. Cobb thereupon went to the testator's home and after talking with testator's wife, out of the presence of testator and without consulting the testator, drew the will. After drawing the will, he, together with other persons, went into the room where testator lay sick and thereupon read the will to the testator. Thereupon testator's wife stated that everything went to her and the testator nodded his head and "seemed" to consent. Testator's wife and one Bud Hannah then raised the testator up in bed, whereupon the testator, with the assistance of Mr. Cobb and those around him, made his mark on the will. It appears that the testator was not able to speak and he did not request the subscribing witnesses to sign the will. In fact he made no audible remarks concerning the transaction. Mr. Cobb, in the presence of the testator, and in his hearing, did request C. S. Hill and J. B. Blackford to sign the will as witnesses, which they did in testator's presence. In answer to question, Mr. Cobb said that he did not know the mental condition of the testator at that time, because he did not have any conversation with him; that he seemed to be a very sick man, but that the witness couldn't say as to his mental capacity. Over the objection of plaintiffs, Mr. Cobb was permitted to testify that at the original probate of the will he had testified that the testator was of sound mind.

C. S. Hill, one of the subscribing witnesses, testified that he was in the sick room about an hour and one-half just before the will was signed; that testator asked for a bed pan, speaking in an audible tone; that this was the only remark that testator made during the time that witness was in the room. After the will was read the witness heard testator's wife ask him if he wanted her to have everything and testator nodded his head, indicating yes. Witness signed the will, at the request of

Mr. Cobb, in the presence of testator. Witness stated that he was unable to testify concerning testator's mental capacity, but admitted that at the original probate he testified that testator was of sound mind at the time the will was made.

J. B. Blackford testified that he signed the will as subscribing witness upon the request of Mr. Cobb, in the presence of the testator; that the will was read to the testator and that the witness did not hear the testator make any objections to it. Witness didn't know whether testator recognized him when he first went into the room, but stated that he thought he did and that the testator held out his hand and shook hands with him, but nothing was said. When the witness left he said good-bye to the testator, but testator made no reply, the witness saying that testator seemed to appreciate it but didn't say a word. The witness said he could not say as to the mental condition of the testator.

Dr. R. S. Spears testified that he attended the testator during his last illness, visiting him once or twice daily during the latter part of his illness; that testator was suffering from diarrhea and was passing mucus and a little blood. On the day the will was written, testator's bowels passed frequently, but the testator talked freely and "seemed to realize that he was not getting on." The doctor testified that he asked the testator the questions that he usually asked a patient and that he seemed to realize all that was going on; that his temperature was approximately 102 degrees. The doctor was at the testator's home twice on the day the will was drawn, first about ten o'clock in the morning and later about five o'clock in the afternoon. The witness further said that all through his sickness the testator's mind was "exceptionally clear," considering he was such a sick man; that there were times when opiates had to be administered to him, "but when we did arouse him his mind would be clear; after you let him sleep, he was like any other man under the influence of medicine." On cross-examination this witness testified that about two days before the will was written, testator's brother, Bill

Bingaman, asked him if he thought testator was capable of making a will. The doctor replied that he thought he was, and told him that he would ask Dr. Thornburgh what he thought about it. He thereupon went to the buggy where Dr. Thornburgh was and stated: ''Mr. Bingaman has asked me if I think Henry is capable of making a will and I answered that I thought he was. What do you think about it? Dr. Thornburgh replied, 'Certainly he is capable of making a will' and remarked that he never saw a man as sick as Henry was that had as clear a mind.''

Mrs. Belle Breedlove, a cousin of the testator, testified that she saw testator on the day the will was written; that he shook hands with her and seemed to recognize her, but did not speak.

Dr. A. Simon, a retired physician, visited testator the day the will was written. He testified that as he went into the sick room testator nodded his head and reached out his hand and shook hands with him. In reply to a question asked by the witness as to how the testator was feeling he replied, ''Pretty bad.'' The witness said he didn't know anything about the mental condition of the testator.

John Mahann sat up with testator the night after the will was made. Testator spoke to witness when he went into the room and shook hands with him. Witness said, ''Howdy,'' and testator replied, ''Howdy, John.'' Witness then asked him how he was getting along and testator repiled that he was in ''pretty bad shape.''

W. T. Clark testified that he also sat up with testator on the night after the will was drawn and that testator recognized him and recognized any body that came into the room. Witness did not speak to testator after he went into the room, but said that whenever testator wanted ''the vessel'' he would throw up his hands and make a sign.

E. P. Riddle testified that he was at testator's home until about noon on the day the will was drawn and that testator's mental condition seemed to be good and that

he seemed to know everything. This witness heard a conversation that morning between Billy Bingaman and testator about going after a notary public to draw the will, in which conversation testator's brother said, "How will Hence Cobb do?" To which testator replied, "He will do." This witness further said that, the fall before, testator told him that he intended to give what he had to his wife. On cross-examination this witness testified that it was about sunrise when he first went into the sick room and he there found testator's wife crying. "She told him [testator] that if he hadn't said anything about it, she wouldn't have mentioned it for the world. That was the first remark I heard when I went in. He said, 'When Billy comes, you tell him what you want.' "

Defendants introduced evidence that testator was over fifty years old at the time of his death and that this suit was instituted May 29, 1911.

The evidence upon the part of the plaintiffs was substantially as follows:

Dr. A. H. Thornburgh testified that on the 23rd day of June he visited the testator as consulting physician with Dr. Spears, and from that time on he visited the testator once or twice a day; that on the 23rd day of June testator was suffering from painful, bloody diarrhea and extreme exhaustion; that they administered hypodermic injections of morphine for the pain and some strychnine and bismuth and pepsin; that on the 25th day of June (the day the will was written), testator was much weaker physically; that the disease had produced a condition called "shot," which had a tendency to greatly lower the mental activity and that mentally the testator was "indifferent, sluggish and cloudy and had to be aroused to get him to notice anything;" that "a man in that state might be aroused, if spoken to directly or by calling him by name, and he might know you and perhaps he would answer your question; perhaps in a moment he would have forgotten it, in other words, his surroundings would make no impression upon him, and the man or woman who passed through that condition, if they recover, may have no memory for perhaps days of

what passed during their sickness, yet during their sickness they may be able to answer questions and perhaps recognize people. As a matter of fact a man or woman in that condition has no power of discernment. It begins with a cloudiness of the mind, and perhaps a muttering and delirium of the mind, and as the disease progresses, the patient sinks more and more and passes into a semi-comatose state and finally sinks into coma, from which the patient is aroused with difficulty, and finally dies with exhaustion." That during the first three days the doctor visited testator they gave him enough morphine and opiates to quiet the pain and that this would tend to lessen the power of concentration and judgment. The following question was asked and answer made: "Q. On the 25th of June, in your judgment did Henry Bingaman have sufficient mental capacity to understand the nature and extent of his property and to get in mind his various relatives and those to whom he desired to give and did give his property, if he had been called upon to make a will without the aid or suggestion of any other person? A. I don't think he had." On cross-examination this witness stated that he may have said to Dr. Spears the following: "He may be capable of making a will, but I doubt his ability to do it without outside influence or direction;" and that he said to Dr. Spears, "I think we have a very sick patient. It seems to me that if he has any business that he wants to transact, he ought to be doing it right away." The witness did not remember that he told Dr. Spears that the testator was "thoroughly competent to make a will."

Mrs. John Spencer and Mrs. Mart Cooper, nieces of the testator, testified that they went into the sick room at nine o'clock on the morning of the day the will was made, but that testator didn't recognize them and that they didn't think him competent to transact business at that time.

C. B. Faurot testified that he sat up with testator the night before the will was made. In response to an inquiry testator told the witness that he was feeling "pretty tough." That testator knew the witness and

Ben Skinner, but seemed to be in a stupor most of the time. The witness did not think him capable of attending to any business. Whenever the testator desired attention during the night he would make a motion with his hand.

Miss Laura Homringhausen testified that she was a professional nurse and that she went to the home of the testator two days before he died (this was two days after the will was made). Testator was then in a state of coma at intervals. His bowels moved twenty or twenty-four times that night. The nurse would arouse him to give him medicine and the patient would arouse himself when he needed attention. Sometimes he would not arouse himself when he needed attention and, as a result, the bed clothes had to be changed several times during the night.

Bert Hollingshad testified that he worked at testator's home eight or nine days before his death; that on the morning of the day the will was drawn, witness went into the sick room and asked the testator how he felt and that testator "kinda rolled his eyes up," looked at witness and said, "I don't know you." He didn't think testator was able to transact business that morning. Witness further testified that one morning prior to this time testators wife said, "You folks go ahead and eat breakfast, I am going in and talk to Henry about making a will." Later the witness went into the sick room where testator and his wife were talking about a will and heard the testator say, "I don't want to make a will, right now at the present." That his wife said. "I'd rather you would have some body come out and have a will made out so I would be safe." This was three days before the will was made.

Ben Hollingshad testified that after testator's death he had a conversation with testator's wife in which she told him that she had often tried to get her husband to make a will before he did and that at last she told him she was going to have a will made and "they sent for Mr. Cobb." This witness testified that he had another conversation with testator's wife shortly prior to her

death in which she told the witness that she "was about to get into trouble over this will and she was figuring on transferring this property to her brother Robert Hannah." She asked the witness what he thought about it and he advised her that he did not believe she could "head off litigation" that way.

Mrs. Sarah Howell testified that she had a conversation with Belle Bingaman after testator's death in which testator's wife stated that she came very near being left without plenty and that she saw that if she didn't stay with her husband and watch him pretty close that he would not make a will; that she hired a girl to do the work and that she and her brother waited on testator and that she didn't believe her husband would have made a will had testator been left with the Bingamans.

Mrs. Dave Willis testified that she had a conversation with Mrs. Bingaman after her husband's death in which she stated that when she first began talking to testator about making a will he stated, "I have got no will to make;" that she kept talking to him about it until he finally agreed to it and they sent and got a man to draw the will; that she and her brother stayed with testator day and night to keep the other folks away, and that if this had not been done testator would never have made a will.

S. J. Galloway testified that four or five days before the will was made some people whom testator had known all his life called to visit him. After they had gone testator whispered to witness, "Who are those boys?" Witness did not think testator competent to transact business. Three or four days before the will was made testator's wife sent for the witness to come and talk to her husband about making a will. The witness went into the sick room and said, "Henry, I don't want to alarm you, but you are a very sick man, you may live longer than me, but we haven't the promise of another day; I want to know if there is anything that bothers your mind; have you a will made; do you want to make a will?" To this testator replied, "No, I don't." After the testator's death the witness saw his wife in town and

she said to witness, "Old man Willis is here; he is here to break up the will or destroy it; he is here to make me trouble." Witness replied, "Maybe not." She then said, "You will see that is what he came for." She then asked the witness to go and see what Mr. Cobb would say about testator's being in his right mind when the will was made. On cross-examination the witness testified that Billy Bingaman married his sister.

John Bingaman testified that testator was over sixty years old at the time of his death and always wrote his own name. The witness was at testator's home the days the will was drawn. He did not think testator competent to transact business that day. On cross-examination this witness testified as follows: "Cobb drew up the will on the back porch; she [testator's wife] went into the room, got a chair and sat down by his [testator's] head and said, 'Now Henry, you want me to have everything you have got, don.'t you Henry?' Then Mr. Cobb said, 'Real estate and personal property.' Then she said, 'Yes, Henry, everything.' Then he nodded his head, you could barely tell that he nodded his head. Henry never said a word; in my judgment and opinion, he neither knew or understood what was going on." Q. "When the question was asked him, real or personal, he nodded his head; don't you think he knew what was said? A. He might have known what she said. We were willing for her to have all the property as long as she lived; there was sixty acres of land worth fifty dollars an acre, and personal property of four hundred dollars."

William Bingaman testified that he was a brother of the testator and that he was there when the will was drawn, but was not in the room when it was signed; that five or six days before the will was drawn testator told the witness that his wife had been trying to get him to make a will, but stated that he was not going to make one. He stated further that if he were going to make a will he would give her all of his personal property, but that as far as the real estate was concerned he would let the law provide for that. The witness further testified that one morning Mrs. Bingaman asked him to talk

to testator about making a will. Witness refused, saying he could not do it on account of the condition testator was in. She thereupon asked witness to see Sam Galloway about talking to testator and that witness saw Galloway that day. The witness admitted that upon the request of testator's wife he went to see Mr. Cobb to inform him that they wanted him to make a will. The witness denied the conversation between him and testator as narrated by witness Riddle. The witness was further permitted to testify that he rode to town that day with Mrs. Sweeney, and that he told her that testator was a very sick man, but that he did not remember saying that the testator did not have a degree of fever that morning and that he was conscious and seemed to know everything and recognize everybody.

In rebuttal defendants offered the following testimony. Mrs. Ida Sweeney testified that she rode to town with William Bingaman on the 25th day of June, 1909, and that he told her that the doctor had told him that the testator hadn't even a degree of fever that morning; that he was going to town to get Hence Cobb to come out and write the will; that Henry was conscious and seemed to know everything and recognize everybody.

Mrs. Sadie Crouch testified that she was present with Mrs. Bingaman all the time that Mrs. Bingaman was at Ben Hollingshad's and that the conversation which witness Ben Hollingshad related as occurring between him and Mrs. Bingaman, about deeding the property to Mr. Hannah, never occurred.

Robert Hannah testified that he stayed at testator's during most of his last sickness, and that he heard the conversation between Billy Bingaman and the testator wherein they agreed that Hence Cobb would do as well as anybody to write the will and that in that conversation William Bingaman said to testator, "I will go to town and get Hence Cobb to come." The witness said he could not see any difference in the mental condition of the testator that morning from what it had been all the time; "he knew everything—all about everything—

and he knew everybody all the time and he always made his wants known."

Mrs. Jane Taylor testified that she was a sister of Belle Bingaman and stayed at testator's several days before his death; that he knew "everything and everybody" and the witness never noticed any change in testator's mental condition.

Dr. Spears was re-called and testified that in July, 1912, Dr. Thornburgh asked him if he was going to Hartville court and that he replied, "Yes, it seems to me foolish; there is no doubt in my mind of the man being capable of making a will." He said, "He might have been capable of making a will, but in his weakened condition of mind, he would have been easily influenced."

Plaintiffs in rebuttal re-called Ben Hollingshad who testified that at the time Belle Bingaman had the conversation with him about deeding the property to Robert Hannah, Sadie Crouch was not present, but was out in the kitchen talking to the witness's wife.

William Bingaman re-called by plaintiffs testified that the testimony of Bud Hannah and Mrs. Taylor as to the alleged conversation between witness and testator, on the morning that the will was drawn, about going after Cobb, was untrue.

Plaintiffs then introduced in evidence defendants' original answer which was a general denial.

I. As we gather it from their brief, appellants' main contention is that the court erred in overruling their demurrer to the evidence, offered at the close of the case.

In this behalf they insist that there was no sufficient evidence (1) of testamentary capacity or (2) of the due and proper execution of the will.

First, as to point (1) above: Was there sufficient evidence of testamentary capacity to justify the submission of that question to the jury? It will serve no useful purpose to here repeat the evidence detailed in the foregoing statement of facts. A careful review of the same will disclose

Testamentary Capacity.

270 Mo—40

that if appellants' evidence is to be believed the testator was without sufficient mind to make a will. If, on the other hand, the testimony of respondents' witnesses is to be believed the testator did have mind sufficient in this regard. Under such conditions this question of fact was therefore one for the jury's determination. [Heinbach v. Heinbach, 262 Mo. 69, l. c. 82-3.]

Now, with reference to point (2) above: Was there evidence of the due and proper execution of the will? In determining the correctness of a ruling on a demurrer to the evidence the opposite party's evidence is taken as true and every favorable and reasonable inference arising from the evidence is to be allowed. Assuming then, as justified by respondents' evidence that testator was possessed of testamentary capacity, he must have known the contents of the will before he affixed his mark thereto, because from the evidence it appears that the will was read aloud to him before he signed the same. The only other matter remaining for discussion under this point is with reference to the sufficiency of the testimony to establish the proper witnessing of the will by the subscribing witnesses. Appellants contend that there is no evidence that testator verbally requested the subscribing witness to sign the will. In this statement appellants are correct. However, we know of no rule, in this State, that requires that the testator shall verbally request the attestation by the subscribing witnesses. The statutes of some of the states do so require. [Remsen on the Preparation & Contest of Wills, page 354.] But the Missouri statute (Sec. 537, R. S. 1909), in this regard, merely provides that the will *"shall be attested by two or more competent witnesses subscribing their names to the will in the presence of the testator."* (Italics ours).

In the case at bar it appears that after the will had been read to the testator and he had nodded his assent thereto and affixed his mark, Mr. Cobb, in the presence and hearing of testator, requested the subscribing witnesses to sign the will, which was, by them, accordingly done in the presence of the testator. Under the authori-

*Due Execution of Will.*

ties this was certainly sufficient evidence to establish the fact that the will was properly attested by the two subscribing witnesses. [Cravens v. Faulconer, 28 Mo. 19; Mays v. Mays, 114 Mo. 536, 1. c. 541; Hughes v. Rader, 183 Mo. 630, 1. c. 701, and cases therein cited; Lindsey v. Stephens, 229 Mo. 600, 1. c. 615 et seq.]

The court did not err in overruling the demurrer to the evidence.

II. It is next contended that the court erred in overruling appellants' motion to strike out respondents' answer, on the ground that the amended answer contradicted the original answer.

*Motion to Strike Out.*

The alleged motion did not undertake to perform the function of a demurrer. It was purely a matter of exception which could be preserved only in the bill of exceptions. The motion itself is not in any manner preserved in the bill of exceptions and, for that reason, an appellate review of the same is precluded. [Shohoney v. Railroad, 231 Mo. 131, 1. c. 153.]

III. Appellants offered as a witness B. F. Skinner, husband of one of the plaintiffs. Prior to being offered as a witness he had, upon motion, been made a party plaintiff. Upon objection being made, by defendants, the court held that he was incompetent to testify in the case. This is assigned as error.

*Witness's Competency.*

After the ruling as to incompetency was made, it appears that the matter was then abandoned and no offer of proof was made, indicating what the witness's testimony would be if he were permitted to testify.

Under this condition of the record the point as to the witness's competency becomes a moot question, and therefore one which is unnecessary to determine. This because—even though we should decide that the witness was competent—we would still be unable to hold that the trial court committed reversible error unless it should further appear that proper and material testimony-was also thereby rejected. Absent an offer to prove, we have no way of determining whether proper evidence was re-

jected. We, therefore, express no opinion as to the competency of the witness.

IV. Appellants contend that the court erred in permitting the respondents to cross-examine two of their own witnesses (the subscribing witnesses), by asking them if they had not sworn in the probate court, upon the original probate of the will, that the testator was of sound mind when the will was made.

*Cross-Examining Subscribing Witnesses.*

It appears from the evidence that the subscribing witnesses were unwilling to testify as to the mental condition of the testator; this, no doubt, gave the trial court ground for the belief that they were in a sense hostile or unwilling witnesses. Under such circumstances, the trial court in the exercise of a sound discretion may permit the party to cross-examine his own witness, at least to the extent here permitted. [State v. Duestrow, 137 Mo. 44, 1. c. 84-5; Ashby v. Gravel Road Co., 111 Mo. App. 79, 1. c. 83; State v. Draughn, 140 Mo. App. 263, 1. c. 267-8.]

We do not consider the action of the trial court in this case as an abuse of that discretion.

V. Respondents' instruction numbered 4 is not erroneous because it told the jury that it was not necessary that testator verbally request the subscribing witnesses to sign the will. Instructions 4 and 11 clearly conveyed to the jury the idea that in order to find that the will was properly witnessed they should find that it was signed by the subscribing witnesses in the presence of the testator and with his knowledge and consent.

*Instructions.*

The statute, as above mentioned, merely requires that the subscribing witnesses sign the will "in the presence of the testator." Of course, the word "presence" necessarily includes knowledge of the act and acquiescence thereto upon the part of the testator. This knowledge and acquiescence upon the part of the testator can be shown in different ways, viz.; by verbal request upon the part of the testator or by any other act or conduct

upon the part of the testator or other evidence which would show that testator had knowledge of the attestation and consented or acquiesced therein. [See authorities cited under paragraph one above.]

The case of Miltenberger v. Miltenberger, 78 Mo. 27, cited and relied upon by appellants, does not hold that a request upon the part of the testator is a necessary prerequisite to the right of the subscribing witness to attest the will. In that case the will was written in a language not understood by the testatrix, and the fact that the testatrix did not request the witnesses to sign the will was commented upon, in an argumentative way, by the court, as merely showing an absence of knowledge upon the part of the testatrix that she was making a will. The proof of the execution of the will was held to be defective, not because the testatrix failed to verbally request the witnesses to sign it, but because there was an absence of any proper evidence that testatrix knew that the instrument she signed was in fact a will.

The judgment is affirmed. All concur.