Michael Patrick MAURATH et
al., Respondents,

v.

Gloria Francis SICKLES et
al., Appellants.

No. 38779.

Missouri Court of Appeals,
Eastern District,
Division Four.

June 12, 1979.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Sept. 17, 1979.

Application to Transfer Denied Oct.
10, 1979.

Edward M. Peek, St. Louis, for appellants.

John L. Sullivan, St. Louis, for respondent.

STOCKARD, Special Judge.

Will Contest.

The testatrix, Marie M. Jakubowski, died at age 77 leaving two daughters, Doris Petton and Gloria Sickles, proponents of her will, and twelve grandchildren, eight of whom are children of Jean Maurath, a deceased daughter, and who are the contestants of the will. The instructions submitted to the jury the issues of proper execution of the will, the testamentary capacity of the testatrix, and undue influence. The jury returned a general verdict, nine jurors concurring, that the instrument in issue was "not the last will and testament of Marie M. Jakubowski, deceased." The proponents have appealed. We reverse with directions.

On October 8, 1974, Mrs. Jakubowski executed the document in question which was entitled "Last Will and Testament of Marie M. Jakubowski." She provided therein that the bulk of her estate should go to her two living daughters, Doris Petton and Gloria Sickles, with specific bequests of 26 shares of Sears-Roebuck stock to each of the eight children of Jean Maurath, and 65 shares to each of her four other grandchildren, the children of Doris Petton and Gloria Sickles, and a lesser number of shares to each of three religious organizations.

In the early part of 1974 testatrix called Mr. James R. Hartung, an attorney who had been recommended to her by the pastor of her church, and stated that her previously employed attorney had died and that she wanted to change her will. Mr. Hartung met with the testatrix and drafted a will for her which she executed on February 19, 1974. We need not set forth in detail its provisions. It is sufficient to say that Mrs. Jakubowski disposed of the bulk of the estate by making equal bequests to each of her three daughters, with the provision that in the event of the death of a daughter, the bequest to that daughter should go to her children in equal shares. That will also contained specific bequests to each of her twelve grandchildren; 26 shares of Sears-Roebuck stock to each of Jean's children, and 65 shares to each of Gloria's and Doris' children.

Mrs. Jakubowski called Mr. Hartung again about October 1, 1974. She stated that her daughter Jean had died, and as stated by Mr. Hartung, "She wanted * * to take that daughter's share and divide it among her two living daughters." Mr. Hartung testified that he discussed with her the consequences if the then existing will was not changed, and that Mrs. Jakubowski stated that she did not want "Jean's share to go to her [Jean's] children" because "she said that if those kids got that money they would probably give it to their father," but that she did want the specific bequest to each of 26 shares of Sears-Roebuck stock to remain in her will.

Mr. Hartung testified that no one else was present during his discussions with Mrs. Jakubowski concerning the changes in her will, and that he never discussed the provisions of the will with anyone else.

Mr. Hartung prepared a new will according to the instructions of Mrs. Jakubowski, and at her suggestion arranged with Denney and Jane Hunter, husband and wife who were friends of his, to act as witnesses. They accompanied him on October 8, 1974, to Mrs. Jakubowski's apartment. While Mrs. Jakubowski was seated at the kitchen table and in the presence of Mr. and Mrs. Hunter, Mr. Hartung read the new will to her and explained the changes he had made, and as he did so Mrs. Jakubowski followed him by reading a copy of the will with the aid of a magnifying class. Mr. Hartung then told the two witnesses to stand where they could see Mrs. Jakubowski sign the will, and he told them to read the attestation clause. It is agreed that Mrs. Jakubowski did not affirmatively state to the witnesses that "this is my will," or make a personal request to them to sign the will as attesting witnesses. However, Mr. Hartung, her attorney, did state to them that the document was her will, and the communication of this knowledge to Mr. and Mrs. Hunter is clearly demonstrated by the circumstances, and then in the presence of Mrs. Jakubowski he requested them to sign the will as attesting witnesses. Mrs. Jaku-

bowski, Mr. Hartung and Jane and Denney Hunter each signed the will in the presence of the others.

■ In a will contest the action is commenced by the filing of a petition by the contestants, but the burden is on the proponents to establish a prima facie case that the instrument was executed and signed by the testatrix as her last will and testament, that the signatures of the attesting witnesses were placed on such paper in her presence and at her request or with her consent, and that at the time she executed the will she was of sound and disposing mind and memory. *Gordon v. Burris*, 153 Mo. 223, 54 S.W. 546 (1899); *Houghton v. Jones*, 418 S.W.2d 32 (Mo.1967).

The publication of the will by the testatrix, that is, a declaration that "this is my will," and the request to the witnesses to attest the will need not be made by the use of any particular words or by express words, but may be evidenced by acts, signs or conduct, and the publication and request to the witnesses may be inferred from the circumstances. *Strahl v. Turner*, 310 S.W.2d 833 (Mo.1958); *Look v. French*, 346 Mo. 972, 144 S.W.2d 128, 133 (1940); *Hughes v. Dwyer*, 546 S.W.2d 733 (Mo.App. 1977); *Bingaman v. Hannah*, 270 Mo. 611, 194 S.W. 276 (1917). In *Clark v. Crandall*, 319 Mo. 87, 5 S.W.2d 383 (1928), it was ruled that a request by the scrivener to the witness made in the testator's presence amounted to a request by the testator. The *Look* case presents a factual situation remarkably similar to this case. There the testator read the document and signed it. Then in his presence and in his view the document was passed to the witnesses and the scrivener indicated to them by gestures where they were to sign, which they did in the presence of the testator and without objection by him. The court said: "It is hard to conceive of a clearer case of implied request. There was no question of fact here upon which a jury could pass," and "The trial court therefore properly directed a verdict for the proponents, * * *."

■ The evidence of the proponents clearly established due execution of the will, and the contestants offered no evidence to the contrary. They contend only that there was no publication of the will by the testatrix or request by her to the witnesses to attest her will. We conclude that in the factual circumstances proponents met their burden of proof as to due execution of the will.

All three of the attesting witnesses testified that based on their personal observations of the testatrix it was their opinion that at the time she signed her will she was of sound mind. None of the contestants' witnesses expressed an opinion as to the testamentary capacity of Mrs. Jakubowski, and no expert witness on this issue was offered by contestants.

Mrs. Jakubowski was 77 years of age, she had an artificial leg and walked with a cane. Her eyesight was poor but she could see to read, at least with the help of a magnifying glass. She was diabetic and took insulin by self-injection. She also took medicine for hypertension. On three occasions in 1974 she visited her physician for the purpose of a general check-up. At her last visit, September 17, her condition had improved since her previous visit. Her blood-sugar level was normal, and her blood pressure was "normal for a woman her age." The doctor testified that at that time he did not detect the presence of any fatal illness.

During 1974 Mrs. Jakubowski took care of her apartment, did most of her own cooking and managed her business affairs including the negotiations for a mineral lease on property she owned. She did some of her shopping at the grocery store, but was taken there by her daughter or by friends. Her banker testified that he had known her for 14 years, that she had several outstanding loans at the bank, and that every two or three months she would go to the bank or call him. When the prime rate of interest would fluctuate she would negotiate with him for a more favorable rate of interest on her loan. Her daughter, Doris, would bring her to the bank but he never discussed business with her.

At the time of Jean's death in September 1974, Mrs. Jakubowski made the "majority" of the arrangements with the funeral parlor, and furnished the needed information for the preparation of the death certificate. She also obligated herself to pay the funeral expenses. The undertaker testified that she recognized people when they came to the funeral parlor, she spoke coherently, and "reminisced old times" with those with whom she used to work. At one time the undertaker observed her approach the casket and talk to Jean, but he added, "that is nothing unusual."

In addition to the physical condition and age of testatrix, contestants rely on the following evidence to authorize a finding of testamentary incapacity.

Rebecca Hampsten, a contestant, testified that she saw testatrix (her grandmother) visit her (Rebecca's) mother (Jean) in the hospital in the summer of 1974 about four or five times. She also saw testatrix at the funeral parlor after her mother died in September. At the funeral parlor her grandmother was "upset" and "grief stricken," but Rebecca testified that under the circumstances she "wasn't in too good a shape" herself. On October 8, Rebecca and her sister, Kathleen, went to testatrix' house about 2:00 o'clock in the afternoon. Gloria opened the door and Rebecca and Kathleen went into the living room. After a conversation with their Aunt Gloria, Rebecca and Kathleen left without seeing their grandmother who was in bed. Rebecca saw her grandmother "quite a bit" after that and she talked to her on the telephone the day before she had the stroke which resulted in her death. At one time the testatrix asked Rebecca and her husband "what she should do" about her money, but they did not advise her. At the time of her death Jean owed the testatrix $4,500, and Rebecca testified that she told her grandmother, "Grandma, don't go getting upset about the forty-five hundred dollars that we owe you, because I will get the money for you. Just don't be getting upset." Her grandmother replied, "Well, I'm not worried about that." At another time testatrix talked to Rebecca about the possibility of

another sister and her husband living with her. When asked if her grandmother had made any reference to "changing wills," Rebecca testified that her grandmother said, "I don't know what to do with my money now that Jean is gone," and that she said that Gloria and Doris would be taken care of by their husbands, but "Jean was her only worry." Following the death of Jean the testatrix "didn't feel good," she "laid down a lot of times" and took "quite a few" pills.

Kathleen Thompson, also a contestant, testified that after she and Rebecca went to her grandmother's house and were met at the door by her Aunt Gloria, she saw her grandmother at her home and in the hospital. Her grandmother would say, "What shall I do with my money?" She had not previously asked her advice on financial matters. Kathleen did not purport to advise her on this occasion. Instead she said: "Grandma, I don't know what to tell you what to do. You know, do whatever you want." Kathleen testified that her grandmother did not "say too many favorable things" about her father, who was divorced from her mother, but she never heard her grandmother say anything derogatory about any of the contestants.

Leo Randy Maurath, a contestant and a brother of Rebecca and Kathleen, was a member of the Air Force and at the time of trial had been in the service four years. He saw his grandmother (testatrix) at the funeral parlor when his mother (Jean) died, and he said "Hi, Gram," and told her his name, and "she'd say something, and she'd call me by another name, and I guess she just couldn't—I don't know if she was that upset or just couldn't remember who I was." After the funeral he went to his grandmother's house and, as he said, "we sat around, I guess everybody just kind of got together and tried to figure out the issues that were, you know, what was going on; after my mom's death, what was taking place." He stated that there was only one "major issue" and that was about his sister Ramona. Leo testified that at one time he returned from the Air Force on

leave, and every time that he saw his grandmother "she just seemed like she was kind of spaced out, you might say. \* \* \* I couldn't never seem to get across to her as far as, you know, who I was \* \* \*."

Randall Louis Maurath, also known as George, was 17 years old at the time of trial. He spent part of the summer of 1974, and until the middle of August, with his grandmother at her house. His cousin and his wife were also there. His grandmother prepared some of the meals, and sometimes his cousin's wife helped. While there he saw his grandmother "take handfuls at a time" of pills, and she would then "start strumping around, get real groggy" and "go to sleep." At the funeral parlor after his mother (Jean) died, his grandmother was "upset" and "tore up inside" and she failed to recognize him and called him Tony which was the name of his older brother.

In rebuttal, contestants offered testimony of Yvonne Stilinovic, the sister of Jean's former husband. She testified that when she entered the funeral parlor after Jean's death she saw testatrix standing at the casket and she was "very upset" and saying, "Oh, my Ge-Ge, oh, my Jeanie." Yvonne later went to her and told her who she was. Testatrix then grabbed her hand, but she could not recognize Yvonne because "she couldn't see you."

Proponents assign as error the submission to the jury of the issues of due execution of the will and testamentary capacity because there was insufficient evidence to authorize a finding of improper execution or lack of testamentary capacity. Contestants argue that the proponents had the burden of proof as to each of these issues, and that the proof depended in part on oral testimony, and for that reason it would have been improper for the court to direct a verdict for them on either of these issues. They cite only *Reeves v. Smith*, 468 S.W.2d 713 (Mo.App.1971), which was not a will contest suit.

It has long been the rule in this state that "a court is ordinarily not justified in directing a verdict in favor of the party having the burden of proof, when the evi-

dence relied on consists of oral testimony." *Price v. Bangert Brothers Road Builders, Inc.*, 490 S.W.2d 53, 57 (Mo.1973). See also *Cluck v. Abe*, 328 Mo. 81, 40 S.W.2d 558 (1931); *Schaefer v. Accardi*, 315 S.W.2d 230 (Mo.1958); *Beezley v. Spiva*, 313 S.W.2d 691 (Mo.1958). However, it is equally well established that in a will contest, even though the proponents have the burden of establishing a prima facie case as to due execution, *Fletcher v. Ringo*, 164 S.W.2d 904 (Mo. 1942), and as to testamentary capacity, *Houghton v. Jones*, supra, when the contestants then fail to present substantial evidence as to either issue, that issue should not be submitted to the jury, *Fletcher v. Henderson*, 333 Mo. 349, 62 S.W.2d 849 (1933), and to do so over objection constitutes reversible error. *Pasternak v. Mashak*, 392 S.W.2d 631 (Mo.App.1965). As stated in *Houghton v. Jones*, supra at p. 39, "The established rule in Missouri is that in the trial of a will contest where the issue of mental incompetency is at issue, the proponents of the will are required to show that at the time the will was executed the testator was of sound mind. The contestants, *to make a case for a jury*, are then required to come forward and introduce substantial evidence to prove that the testator did not have the mental capacity to make a will." (Emphasis added.) See also *Dowling v. Luisetti*, 351 Mo. 514, 173 S.W.2d 381 (1943); *Lewis v. McCullough*, 413 S.W.2d 499, 505 (Mo.1967). The rationale for this procedure is set forth in 3 Bowe-Parker: Page on Wills § 26.100 as follows: "If the proponents are required to make out a prima facie case and the contestants then have the burden of showing that the instrument is not testator's will, the case may be dismissed, if the contestants fail to produce sufficient evidence after the proponents have made out a prima facie case. This is explained as a waiver by contestant of the contest." For cases in which the trial court directed a verdict for proponents after they presented a prima facie case as to either due execution or testamentary capacity or both, and the action was affirmed on appeal, see *Lewis v. McCullough*, supra; *Dela-*

ney v. *Coy*, 407 S.W.2d 902 (Mo.1966); *Winn v. Matthews*, 235 Mo.App. 337, 137 S.W.2d 632 (1940); *Aaron v. Degnan*, 272 S.W.2d 216 (Mo.1954); and *Wright v. Stevens*, 246 S.W.2d 817 (Mo.1952). For cases in which it was ruled on appeal that it was error to submit to the jury the issue of due execution or testamentary capacity because, after proponents had made a prima facie case, the contestants did not present substantial evidence to sustain their challenge to the will, see *Nute v. Fry*, 341 Mo. 1138, 111 S.W.2d 84 (1937); *Pasternak v. Mashak*, supra and *Glover v. Bruce*, 265 S.W.2d 346 (Mo.1954).

Contestants set forth in their brief several circumstances or incidents which they contend constitute substantial evidence of lack of testamentary capacity. We shall set them out followed by our comments as to each.

1. The will was executed by testatrix "merely eleven days" after the death of her daughter and "less than that period of time since she stood by her daughter's casket repeating her name over and over."

The fact that testatrix changed her will eleven days after her daughter's death and the fact that she, a grieving mother, stood by her deceased daughter's casket and spoke her name will not support an inference of lack of testamentary capacity.

2. At the funeral parlor testatrix failed to recognize her grandson who had stayed with her for a month and half during the previous summer, and she was "confused" as to the identity of another grandson who had returned to the funeral from military service "even after he told her his name," and attempts by him to carry on a conversation with her were of no avail.

It is admitted that Mrs. Jakubowski had poor eyesight. There is no evidence as to the lighting conditions at the funeral parlor. Also, the conclusions of the grandson concerning his inability to carry on a conversation, without more, permit no inference of lack of testamentary capacity. See particularly *Mangan v. Mangan*, 554 S.W.2d 418, 422 (Mo.App.1977), where it was argued that the fact that the testator mistook the first names of some of his collateral kindred demonstrated testamentary incompetency. The court stated: "We do not agree; the testator had a great many kinsmen, and he could have had testamentary capacity without knowing whether all of them were alive, and without remembering the names of all his nephews." Mrs. Jakubowski had twelve grandchildren, and one whose name she did not readily remember at the funeral parlor had been absent in the Air Force. There is no evidence that she saw the others regularly or that she usually was able to remember the name of each.

3. "Just before" the grandson left his grandmother's house after staying with her he observed that she "was really feeling bad."

This physical condition, without a showing that she was affected mentally, permits no inference of lack of testamentary capacity.

4. After Jean's death the testatrix asked Kathleen, a granddaughter, "What shall I do with my money?" but she had never asked her for advice before.

This is immaterial to the issue of testamentary capacity.

5. The "state of mind" of the testatrix is "well exemplified" by the testimony of Rebecca Hampsten in quoting her grandmother as saying, "I don't know what to do with my money now that my Jean is gone," and that her daughters Gloria and Doris would be taken care of by their husbands and Jean was her only worry.

Contestants do not state in their brief what "state of mind" is exemplified by these remarks. We see no relevancy to these statements and they do not support an inference of lack of testamentary capacity.

6. Randall saw his grandmother "take handfuls of pills," and Rebecca stated her grandmother took "quite a few pills."

Without some showing that this medicine had an adverse effect on her mentality this is immaterial to the issue of testamentary capacity.

We conclude that proponents established a prima facie case as to due execution of the will and as to testamentary capacity, and that the contestants failed to present substantial evidence to make a case for the jury as to either issue. Therefore, it was error for the trial court to submit either issue at the request of the contestants to the jury over the objection of the proponents.

The issue of undue influence was also submitted to the jury, and proponents contend that contestants failed to meet their burden of proof as to that issue.

In addition to the facts and circumstances previously set out, contestants rely on the following circumstances.

Mrs. Jakubowski lived alone in an apartment next door to her daughter Doris who worked of days but visited frequently with her mother. There was an unlocked connecting way-between the two apartments. They maintained a joint banking account into which each made deposits and from which both made withdrawals, but a record was kept as to how much of the balance belonged to each. Mrs. Jakubowski wrote and signed checks for ordinary expenses and to make contributions, but on occasions Doris wrote the checks for her. Doris sometimes wrote checks on this account for these purposes. She also helped her mother with her tax returns and would drive her to the bank where she could conduct her own business. Gloria and her mother had the same insurance agent, and shortly after Jean's death they met with him at Mrs. Jakubowski's apartment. Mrs. Jakubowski conferred with him about an insurance policy on Jean's life of which Mrs. Jakubowski was the beneficiary, and Gloria paid her own insurance premium.

On October 8, the day the will was executed Gloria was at her mother's apartment. Although Mr. Hartung was not to arrive until five o'clock or thereafter, Gloria was there earlier "to have lunch and everything, have it out of the way before Mr. Hartung arrived." Gloria testified that she did not recall that any of the grandchildren of testatrix were there that day, but Rebecca and Kathleen testified that they went to the apartment about two o'clock to see their grandmother and Gloria met them at the door. Their grandmother was there in bed, but they did not get to see her. Before Mr. Hartung arrived, Doris came from work and she and Gloria were in their mother's apartment when the will was read by Mr. Hartung and executed by testatrix.

The burden of proving undue influence rests upon the contestants. *Martin v. O'Connor,* 406 S.W.2d 41 (Mo.1966). By "undue influence" is meant "such influence as destroys the free choice of the person making the will," MAI 15.03, and to meet this test the exerted influence must be of such strength that the will is not that of the maker but is that of the party exercising the influence. *Sweeney v. Eaton,* 486 S.W.2d 453, 455 (Mo.1972); *Patton v. Shelton,* 328 Mo. 631, 40 S.W.2d 706 (1931). A presumption arises that the testatrix has been unduly influenced by the beneficiary so charged when the evidence shows (a) that a confidential or fiduciary relationship existed between the testatrix and beneficiary; (b) that the beneficiary has been given a substantial bequest by the will; and (c) that the fiduciary was active in procuring the execution of the will. *Simmons v. Inman,* 471 S.W.2d 203 (Mo.1971); *Switzer v. Switzer,* 373 S.W.2d 930 (Mo.1964); *Clark v. Powell,* 351 Mo. 1121, 175 S.W.2d 842 (banc 1943). When supported by substantial evidence, the presumption makes a prima facie case which does not disappear upon the introduction of rebutting testimony but presents an issue for the jury. *Loehr v. Starke,* 332 Mo. 131, 56 S.W.2d 772 (banc 1932); *Pasternak v. Mashak, supra.*

We shall assume that the first requirement necessary to the presumption is satisfied, at least as to Doris, and both Doris and Gloria received not only a substantial bequest, but a substantial increase over that provided for in the previous will of the testatrix. But, assuming a confidential relation between the testatrix and Doris, and possibly Gloria, yet as stated in *Aaron v. Degnan,* supra at p. 221, "that fact alone does not raise a presumption of the

exercise of undue influence," citing *Loehr v. Starke,* supra. See also, *Buckner v. Tuggle,* 356 Mo. 718, 203 S.W.2d 449 (1947). To invalidate the will there must be evidence from which it may be inferred "that undue influence was present in active exercise and sufficient to destroy the free agency of [testatrix] at the time of making the will, so that it is not in fact [testatrix'] will but that of the proponents." *Aaron v. Degnan,* supra at p. 221. See also *Baker v. Spears,* 357 Mo. 601, 210 S.W.2d 13 (1948); *Snell v. Seek,* 363 Mo. 225, 250 S.W.2d 336 (1952); *Glover v. Bruce,* 265 S.W.2d 346 (Mo.1954). An inference of undue influence cannot rest upon a mere opportunity to influence or upon mere suspicion, *Baker v. Spears,* supra, but there must be substantial evidence that undue influence was in fact exerted. *Winn v. Matthews,* 235 Mo.App. 337, 137 S.W.2d 632, 636 (1940).

█ There is no evidence, direct or circumstantial, from which it may be inferred that either Doris or Gloria suggested or even mentioned to their mother that she should change her will after the death of Jean. Neither is there any evidence from which it may be inferred that either Doris or Gloria engaged in any improper activity which was designed to place the idea of changing her will in the mind of their mother. Gloria arrived at her mother's apartment on the day the will was executed in the early afternoon, apparently to prepare lunch and knowing that Mr. Hartung was to come that evening. But it would have been unnatural for a daughter not to assist her invalid mother in such a manner in the circumstances, and it is pure speculation to assume that her presence constituted undue influence.

Contestants make much in argument that at the time of the execution of the will both Doris and Gloria were present in the room. But, as far as shown by the evidence, the will had previously been prepared by Mr. Hartung according to instructions he received from the testatrix, and he had not discussed the will or its terms with either Doris or Gloria. The mere presence of Gloria and Doris at the time of the execution

of the will could have had no effect on what previously had been written into it.

█ Contestants argue that undue influence may be proved by circumstantial evidence, citing *Godsy v. Godsy,* 504 S.W.2d 209 (Mo.App.1973), and we agree. In their brief they then refer to the following circumstances which they contend constitutes substantial evidence of undue influence. We shall set forth those circumstances followed by our comments as to each.

1. Doris, the named executrix, was a joint signer on her mother's checking account which contained commingled funds of Doris and her mother. "The testatrix did not know the balance of the account," and Doris "prepared her mother's tax returns" and went to the bank with her to make loans. Doris also had an unsecured loan from her mother, she was present when her mother negotiated a mineral lease, and she helped her mother adjust insurance claims.

We first note that the statement that testatrix did not know the balance of the joint account is not supported by the evidence. The record shows only that Doris helped her mother prepare her tax returns. Because of her physical condition if she went to the bank or any place else someone had to take her.

We consider these circumstances to authorize a finding that a confidential relation existed between Doris and her mother, but these circumstances do not permit an inference of undue influence.

2. "Both Gloria and Doris were given substantial bequests by the new will."

This is established by the evidence, but it alone does not permit an inference of undue influence, and particularly when the beneficiaries constituted all of the living daughters of testatrix who would be natural objects of her bounty.

3. "Activity in procuring execution of the will was demonstrated by the early appearance of Gloria at her mother's home on the day of the execution of the will * * *; Gloria's turning away of the grandchildren when they attempted to visit

the grandmother on the day of execution; her apparent lie on deposition that no grandchildren appeared at the testatrix' home on the day of execution; both daughters were present in the room when the will was executed, one being seated next to the testatrix all during the reading and execution."

We first note that the evidence does not support a "turning away" in the sense apparently intended. At most it shows that Rebecca and Kathleen called at the apartment of their grandmother, that they were admitted into the living room by Gloria, but they did not see their grandmother who at the time was in bed. We also doubt it is justified to characterize the statement made by Gloria on deposition as an "apparent lie." She was asked if she recollected that any grandchildren were there and she replied "No."

While these circumstances permit an inference of opportunity to influence and perhaps to some would create a suspicion, that is insufficient to authorize an inference of undue influence. *Patton v. Shelton,* supra; *Aaron v. Degnan,* supra; *Godsy v. Godsy,* supra.

4. Contestants assert that the jury "properly considered the testatrix' weakness of mind at the date of the execution of the will and her susceptibility to influence." The only circumstance referred to is that of "the testatrix asking one and all 'What should I do with my money?'"

The record does not show that this question was asked by testatrix of "one and all." The time the question was asked, once of Rebecca and her husband and then of Kathleen, was shortly after the death of Jean. No advice was given. We find no evidence of "weakness of mind" on the part of the testatrix, and no evidence that she was "susceptible" to influence. In fact, the evidence considered as a whole shows a strong active business woman with a will and mind of her own, who admittedly and understandably was grieved at the death of her daughter.

5. "The opportunity of the beneficiaries to exercise influence was ample." Contestants then point out that Doris lived next door and visited her mother frequently.

The proof of undue influence cannot "rest upon a mere opportunity to influence, or upon a mere suspicion." *Patton v. Shelton,* supra, at p. 712. There must be substantial evidence that undue influence was in fact exerted. *Winn v. Matthews,* supra.

6. The will of testatrix made "an unnatural disposition of [her] property in cutting out her grandchildren from their mother's share when it is admitted she loved them all." Contestants assert it is important that the testatrix had stated that both Gloria and Doris had husbands to care for them.

The fact that the testatrix made an "unequal or even unjust distribution of [her] property does not of itself support an inference of undue influence. A [person] has the right to will [her] property to whomsoever [she] chooses, * * *." *Mangan v. Mangan,* supra at p. 421. "The law does not * * * preclude [a] parent if in the exercise of his free will, from bestowing his bounty on one child more generously than on his other children." *Burgdorf v. Keeven,* 351 Mo. 1003, 174 S.W.2d 816, 820 (1943). In *Maddox v. Maddox,* 114 Mo. 35, 21 S.W. 499, 502 (1893), it was stated that "the fact that unjust discrimination was made, coupled with other facts, of old age and great debility of body, are not sufficient to raise an inference that undue influence was exerted by one who received a greater portion of the estate. The tests are mental capacity and free agency. When these exist the testator has the right, as it said, 'to make an unreasonable, unjust, injudicious will; and his neighbors have no right, sitting as a jury, to alter the disposition of his property simply because they may think the testator did not do justice to his family connection.'" See also *Smarr v. Smarr,* 319 Mo. 1153, 6 S.W.2d 860 (1928).

7. "The new will was a sudden change from the old will, coming just a week to ten days after Jean's death."

We find nothing in this circumstance to authorize an inference of undue influence.

None of the above circumstances enumerated by contestants authorize an inference of undue influence; nor do they do so when considered collectively. We are therefore constrained to conclude that the trial court erred in submitting the issue of undue influence to the jury.

The judgment is reversed and the cause remanded with directions that the trial court enter judgment that the instrument in question is the last will and testament of testatrix.

DOWD, P. J., and SNYDER, J., concur.