## HENRY LEE et al. v. MARY LEE et al.; NETTIE BEASLEY, Appellant.

### Division One, June 2, 1914.

1. **PLEADING: Defects Waived.** The defects of a petition to set aside a deed which alleges in general terms that the grantor was feeble-minded, sick and while visiting his daughter and under her influence, executed the deed conveying the land to her without any valuable consideration, containing no specification of fraud and alleging no fact from which undue influence presumably flows, will, notwithstanding its imperfections, if defendant did not challege its sufficiency in the trial court and does not on appeal, be passed by, and the case disposed of on the theory that it impliedly stated a cause of action.

2. **SUIT IN EQUITY: Action to Set Aside Deed: Instructions.** An action to set aside a deed on the ground that the grantor was feeble-minded and it was the result of fraud and undue influence exercised upon him by the grantee, is a suit in equity; and being a suit of equitable cognizance, instructions, asked or given, are utterly out of place, and no exceptions to them will be considered on appeal, even though the case was treated in the trial court as one at law.

3. **INCAPACITY: Age: Sickness.** Old age and sickness do not in and of themselves constitute incapacity to transact the business of devising or conveying land.

4. ————: **Opinion of Laymen.** The opinion of lay witnesses that a grantor or testator was of unsound mind, to be of probative force, is inseparably connected with the facts and opportunities upon which the opinion is based. If those facts are connected, consistent, strong and bear upon the issue, the opinion of such a witness has persuasiveness, cogency and weight; otherwise, it has none of these.

5. ————: **Burden.** In a suit to set aside a deed on the ground that the grantor was incapacitated to make it, the grantee is entitled to the rebuttable presumption that the grantor was of sound mind, and the burden of proof is on those who assert his incapacity.

6. **FRAUD: No Facts.** There must be some facts which constitute fraud before a decree setting aside a deed on the ground of fraud can be permitted to stand: There can be no fraud of a grantee against a grantor, in the mind of a court of equity, unless there are acts, omissions or concealments which involve a breach of some legal or equitable duty, trust or confidence justly reposed and injurious to the grantor, and by which an undue and unconscientious advantage is taken of him.

7. ————: ————: **Deed to Daughter.** It is not of itself a fraud for a married daughter to take a deed to eighty acres of land worth $1500, from her aged father, sorely afflicted with consumption and asthma, and homeless, upon an agreement, expressed in the deed, "to furnish him a home and give him personal attendance his lifetime."

8. **UNDUE INFLUENCE: Deed from Father to Daughter: Fiduciary Relation.** The fact that an aged and homeless father, afflicted with an incurable disease, left the neighborhood of his children and the wife who had separated from him, and went to the home of a married daughter and there made her a deed to eighty acres of land, expressing a consideration of love and affection and an agreement to furnish him a home and attendance for his lifetime, does not establish any such fiduciary relation as raises a presumption of undue influence and casts the burden upon the grantee to sustain the deed. And there being no fact tending to show either the exercise or existence of undue influence, the deed cannot be set aside on any such ground.

9. **CONTRACTS: Are to be Enforced.** Courts sit to enforce fair and just contracts, not to abrogate them.

10. ————: **Sought by Plaintiffs.** The fact that plaintiffs shortly before their father conveyed the eighty acres of land to his daughter deliberately and separately planned to have him convey it to them, upon the same consideration, namely, care and

support, is an implied admission on their part of both its propriety and validity—that he had capacity to convey and power of will to resist undue influence, that the consideration was sufficient, and that a deed so obtained was not fraudulent.

11. **DEED: Consideration.** A deed expressing love and affection and an agreement by the grantee to furnish the grantor a home and give him personal attendance for his lifetime, fully performed, is supported by both a good and a valuable consideration.

12. **APPEAL: No Brief.** It is not only unwise for respondent to file no brief in the appellate court, but he should not complain if the court surmises that his silence is a tacit admission that the judgment in his favor cannot be defended.

Appeal from Christian Circuit Court.—*Hon. John T. Moore*, Judge.

REVERSED AND REMANDED (*with directions*).

*Barrett & Farrar* for appellant.

(1) The burden is on the party asserting the mental incapacity of the grantor at the time of making the deed. Cutler v. Zollinger, 117 Mo. 92. (2) If a person understands the nature of the business and the effect of what he is doing his acts are valid, and this is true though the mind of such person may be impaired by old age and disease. Cutler v. Zollinger, 117 Mo. 101; Cutts v. Young, 147 Mo. 587; Richardson v. Smart, 65 Mo. 14; Keithley v. Keithley, 85 Mo. 217; Boggess v. Boggess, 127 Mo. 305. (3) The exercise of undue influence must be such as will destroy the will power and overreach and destroy the free agency of the grantor. Thompson v. Ish, 99 Mo. 160; Rankin v. Rankin, 61 Mo. 295; Jackson v. Hardin, 83 Mo. 175; Norton v. Paxton, 110 Mo. 456; Pennington v. Stanton, 125 Mo. 658; Wood v. Broadley, 76 Mo. 23. (4) A deed made by an aged person in consideration of an agreement for the grantee to support him is valid and binding. Pennington v. Stanton, 125 Mo. 653; Keithley v. Keithley, 85 Mo. 217.

G. *Purd Hays* and *John T. Hays* for respondents.

LAMM, J.—Henry and James, two sons of John Lee, deceased, sue his other heirs in equity in the Christian Circuit Court to set aside a certain conveyance made by him to his daughter, defendant Beasley, and to vest title in the heirs of Lee as tenants in common, joining a count in partition. Mrs. Beasley, on this record, alone answered. For some undisclosed reason, the count in partition fell out of the case. A decree in plaintiffs' favor stops short with vesting title in the widow and heirs of said John Lee. Mrs. Beasley alone of the defendants appealed, and plaintiffs rested content without partition, taking no appeal.

The land in controversy is the west half of the northeast quarter of section 31, township 28, range 19, in Christian county.

The substance of the allegations of the bill is this: Long prior to the 6th of June, 1910, and on that day, John Lee was "weak and feeble-minded, sickly and diseased, and of unsound mind and incapable of transacting his ordinary business affairs;" that "while visiting with and under the influence of Nettie Beasley" he executed the assailed deed conveying said land to her "without any valuable consideration," on the 6th of June, 1910. The deed (copied into the bill) recites that said John Lee "in consideration of love and affection and the agreement on the part of party of the second part to furnish the party of the first part a home and give him personal attendance his lifetime, do by these presents grant," etc. (The deed is in conventional warranty form.) The bill goes on to allege as follows: "There was no consideration, and that said deed was obtained by fraud and through undue influence exercised upon said John Lee, deceased, with a view to deprive the plaintiffs and defendants herein of their rights in said land. Wherefore plaintiffs pray," etc.

The foregoing is a fair summary of a loose and impoverished bill—a bill making no specification of fraud, no allegation of intestacy and no charge of a fiduciary relation; alleging no fact from which undue influence sprang in fact or by presumption; giving no value to the land; making no averment of the import or effect of the conveyance, but contenting itself with merely copying the instrument; not even directly alleging ownership in John Lee or making any averment relating to the remaining estate of Lee, or the proportion conveyed, or directly charging Mrs. Beasley with the possession or the exercise of any undue influence over him.

However, as the bill is not now questioned, nor was it challenged below by appellant's counsel, we earmark its imperfections and pass them by on the assumption that the cause was tried on the theory the bill impliedly stated a cause of action. If that was an erroneous assumption, then the maxim *communis error facit jus* helps clear the situation a bit.

Mrs. Beasley answered admitting the alleged relationship of the parties to each other and to John Lee, admitting the execution of the deed, averring it "was made for a good and valuable consideration" (setting it forth as does the deed itself) and averring that defendant faithfully performed her agreement "to care for and board decedent" until his death. The answer next alleged that John Lee was not of unsound mind and was not incapable of transacting his business affairs but "was a very shrewd dealer and fully understood his business affairs;" that the deed "was not made under undue influence of any one, but was made by said John Lee of his own free will and accord for the purposes set forth, wherefore," etc.

Treating the suit as one at law instead of in equity, as it was, appellant, at the close of the evidence for plaintiffs and again at the close of the case, asked an instruction in the nature of a demurrer to the evidence,

and on its final refusal her counsel asked a series of instructions declarative of those propositions of law they deemed pertinent to the facts. The chancellor refused them, and the exceptions then saved to his ruling they bring here for review and make much of. However, one of the grounds of their motion for a new trial was to the effect that the decree was not supported by the evidence, but was contrary to it, and error is assigned on the overruling of that motion.

The facts lie in small compass and will appear in connection with the disposition of the question whether plaintiffs made a case for equitable relief under the bill and proofs. The appeal may be disposed of under two heads, to-wit:

(1) Of the instructions (and herein of the demurrer).

(2) Of the sufficiency of the proofs.

I. *Of the instructions (and herein of the demurrer).*

It was taken in ancient times, so a scholarly brother tells me, as within a limbo of unreason to do so useless a thing as to carry owls to Athens. To offer instructions in a cause in chancery is like carrying owls to Athens, coals to Newcastle, herring to Holland, gilding refined gold. The unbending rule of practice is that instructions fill no office at all in an equity case; hence, for appellate purposes, error cannot be predicated or assigned upon the giving or refusing of them. In chancery the question is, not what the chancellor instructed himself to do, or how he talked the matter over with himself—the question is: *Did he seek equity and do it?* We have always so written the law, and doubtless always shall. Doubtless, too, iteration and reiteration are necessary even to so learned a profession as the law, for is it not written by a great authority on the way to promulgate good doctrine: "For precept must be upon precept, precept upon precept; line upon

line, line upon line; here a little, and there a little?''
[*Vide*, Isaiah, 28: 10.]

What is true of instructions in general in equity is
true of demurrers to the evidence in equity. They
amount to the same thing, to-wit, *nothing*. [Troll v.
Spencer, 238 Mo. l. c. 93 et seq.]

It is in law, as in life, one should look about him
and be careful to avoid negligence. Doth not the
proverb say: If one lie down with a beggar, one gets
up lousy? So, if·one rely on instructions in equity, he
leans on a broken staff and gets the worst of it in a
fall. We put the matter in the homely similitudes of
the fireside because the learned discourse in the vener-
able language of case law in that regard (blazoned and
embalmed in nearly every volume of our reports) seems,
like the seeds in the parable, to fall by the wayside or
on stony ground.

Fortunately for appellant in this case, she also
challenged the sufficiency of the evidence to support
the decree; hence the fact that the instructions before
us must be put behind us and that the exceptions saved
to the instructions bring nothing up for review, is not
fatal to her appeal.

II. *Of the sufficiency of the evidence.*

The case on the facts is this:

Henry Lee, one of plaintiffs, testified that his
father lived with him in Christian county for a month
and a half until the 15th of March, 1910, when he left
for Illinois. He describes him as ''mighty poorly, and
had been for some time'' with the consumption and
asthma. In the spring he would ''get mighty low and
in the warm weather he would pick up again.'' He was
not as well as usual when he left for Illinois and would
be bedfast a little while at a time. ''I could not say
exactly about his mind,'' witness said, ''but I rather
think, being in the condition he was in, he hadn't a
very good mind, being in the condition he was in, being

so weak and all." Witness got him to come over to his place and stay, because he was sick. While there witness made a proposition to him that if he would make him a deed to his place he, witness, would keep him during his lifetime and do by him as well as he could. The father replied: "No, I won't do that, I won't deed it to anyone, and when I am done the court will give it to the one I am with." His father then made an offer to give witness the use of the place by the year for keeping him. The contract was written up, but another son wrote the father to come to his place, and on the strength of that letter the contract was not executed, but witness rented the place so that his father would have the rent to come back to, to live on during the winter. Decedent bought his own ticket and made the trip alone to Illinois. He knew what children he had and what land he owned. Witness never knew him when he was not able to name all his children, but considered him of unsound mind; did not know whether his mind was in such condition that he was not able to attend to his business. When he went to Illinois, witness helped him on the train. The land was worth $1500. Two sons and one daughter lived in Illinois. He died there on the 17th of June, 1910. Witness owed his father $50 for rent when he died. "About a month before he went to Illinois," said the witness, "he was easily persuaded and I talked with him about keeping him and having him deed me the land. He refused to do this, but afterwards made the contract with me to rent the land. . . . My father was tolerably easily influenced. I tried to get him to make me a deed, but he refused to do so."

James, a plaintiff (another son), testified to the same effect as Henry. He said his father was in "poor condition" and was "about as weak as he could be to get around," he had asthma and consumption and was "bothered a good deal with age." "His mind wasn't of much account. He had been that way for five or

six years, of course not so bad." "There were times," said witness, "when a body could make most any kind of a deal with him, and times when you couldn't." It seems this witness also tried to get his father to make a deed to him, but his father refused, and told him he was going to Illinois and was going to rent the place out.

Plaintiffs, to make their case, also put on the stand the husband of defendant Beasley, and established by him the following facts: Decedent came to Illinois, to one of his sons there on the 17th of March. That son was afraid to keep him because he had the consumption. So on the 20th of March, he came to the house of witness. A physician was called who pronounced the disease consumption, and said he might live a year and might not. He was nursed and cared for at the Beasley house until he died. Decedent himself brought up the question of deeding the land. He said it was his desire to make the conveyance to the child with whom he died. Witness at first was opposed to his making the deed to his wife, and suggested that he make it to his other sons in Illinois, so that they could take the land and the Beasleys would be paid reasonable wages for taking care of him. The upshot of it all was that the two sons in Illinois were brought into the transaction, and they would not take the land in that way, and then the father made the deed to his daughter, Mrs. Beasley, we take it with the knowledge of those sons. During the time he stayed in Illinois, decedent's mind was sound, but his body was weak. He received nursing, care and attention from the Beasleys until his death and was buried by them. He was around until three days before his death when he became bedfast. Before that he thought he would get well. Witness could not tell from his looks that he was going to die, but admitted he "had no hopes for the man." At the time he made the deed he knew his children and knew what land was deeded. He brought his title papers with him to Illinois and got the land description for the deed in

question from them. The deed was read over to him by the officer drawing it and he said it was just as he wanted it drawn. He made his mark to it and under the direction of decedent two witnesses were brought in to witness the mark. Decedent could not write and witness said he had frequently written letters for him when he was visiting him in Missouri. The land is rough and was not worth much if one had to pay money for it. The deed was delivered and was sent to Missouri for record.

A Mr. Roller testified for plaintiffs, that he knew decedent for twenty-five years. Sometime in February, 1910, witness heard him say to his son, Henry, who wanted a deed to the place: "I won't do that, I will make a contract for a year at a time and if I want to make a change I will do so, for I won't make nobody a deed to take care of me." He described his bodily condition when he left for Illinois to be about as the two plaintiffs had said, but having said he did not know what his mental condition was, he also said he did not notice anything wrong with his mind the last time he saw him, that he was capable of attending to his business and his mind was in a fair condition. Witness said decedent's .wife "had left him" about a year before, and that he lived in a cabin by himself and the neighbors had "to take in things," and that Henry went back and forth and cared for him before he rented the place. Witness lived close and never saw him read or write.

Plaintiffs also introduced a woman named Mary Wilson (we take it she was defendant Mary Lee, now married to Wilson) who said she had formerly been the wife of decedent and was the step-mother of plaintiffs and the other Lee children. Her testimony was to the effect that Lee formerly could write but about six years before had got so nervous he could not. He had been sick five or six years with the consumption. She had separated from him and had not seen him for a year before he died. Before that "at times he had a good

mind and at times he was 'kindy' like a child.  He would even forget and he would even cry about anything that would fret him."  It was when he was feeling badly with the asthma that he would cry when fretted, she said, and then went on to say that during those times he was pretty easily influenced and could be persuaded to do most anything.  About five years before, decedent had an attack of the "lung fever" and for about a week was delirious.  His delusions then are unimportant here.  Her conclusion was that after that his mind was "not as good as it was before."  On cross-examination she admitted that since the week, some years ago, when he had the fever, she never saw him when he did not know enough to take care of his ordinary business, though sometimes he had trouble in counting his money.  She thought from that time on he got weak-minded "but not so weak-minded that he did not know how to take care of his business."

A Mr. Freeman, a neighbor, of decedent, testified he knew him for twenty-six years and that his mind was "a little weak on account of his sickness."  Witness did not know whether he could be influenced if anyone had so desired.  He connected his weak mind with his bad health; saw him shortly before he left for Illinois; had a short conversation with him and "just asked him how he was;" could not tell and did not know what condition his mind was in or whether he was able to attend to his business or not, but hazarded the suggestion that he "was a hard man to understand.  His mind might have been weakened in proportion to his body, or something like that."

Defendant introduced a witness to sustain the issues on her behalf, a Mrs. Tollman (her husband's aunt).  She was a neighbor of decedent, and saw him a number of times before he left.  She never heard of his being weak-minded and knew nothing of the kind.  Her testimony was to the effect that he was "too keen for a

258 Mo.—39

weak-minded man and was smart enough," that when she saw him for the last time his mind appeared strong.

Appellant testified in her own behalf to the effect that her father had not been in good health for a number of years and had had the asthma ever since she knew him, but that he had "a good sound mind." Her father came to her house in Illinois and stayed there until he died. Her testimony did not differ materially from her husband's and we will not reproduce it. It appears that appellant was sick during her father's stay and her husband did nearly all the nursing of him. The Beasleys were out over $100 for medicines, funeral expenses, etc., upon which they had been paid $25 since, said sum being a portion of the rent due on the place by plaintiff Henry Lee for the year 1910. It appears further that decedent had trouble with Henry's wife and could not stay there and before making the deed had expressed his intention of deeding the land to the child that took care of him and had told the other children in Illinois to that effect.

John Lee died eleven days after executing the deed. His exact age is not disclosed, but he is referred to as "the old man." The case, we think, may proceed on the theory he was full of years and carried the accumulated burden of misfortune, sorrow, sickness, lonesomeness and old age. In the simple but graphic language of one witness, "he was bothered a good deal with age." It is not clear whether some defendants are children or grandchildren of John Lee, nor is it material on appeal. As we understand the record, three of his children resided close by the place in Central Illinois where he went and remained until his death. The rest of them, possibly, resided in the neighborhood of his former residence in Christian county. His wife, Mary, from whom he was separated, did not join in the deed to Mrs. Beasley.

On such record, the trial chancellor found "the issues for the plaintiffs" on the first count. Having

made that general finding, he at once went on to find specifically, in the same connection, that the deed was "without consideration from the grantee" and was executed "by fraud and undue influence . . . which the grantee . . . exercised over" grantor. The decree entered on such findings set aside John Lee's deed, divested title out of appellant and vested it into the heirs of John Lee, subject to his widow's dower. The question is: Did the decree do equity. We are of opinion it did not. This, because:

(a) Insofar as it adjudged dower in the widow of John Lee no fault can be found with it. Her not being a party to Mrs. Beasley's deed, left her dower outstanding and outstanding it is to this day. No one seems to dispute her dower right.

*Dower.*

(b) It will be observed that the decree does not specifically find or adjudge John Lee lacking in mental capacity to make a conveyance. The court, however, did find all the issues for plaintiffs generally. Had the decree stopped with that general finding, it would have covered the issue of mental capacity to convey, but presently the chancellor made specific findings of undue influence, fraud and want of consideration. Something, therefore, might be said in favor of the theory that by including fraud, undue influence and want of consideration in his specific findings, and excluding a specific finding on mental incapacity, the trial chancellor should be taken as excluding that element of the case as a basis for his decree on title, this under the maxim, *expressio unius est exclusio alterius*. It would be unprofitable to let the issue of mental capacity to convey hinge on speculative theories of construction. We prefer to take the bull by the horns and let the point ride off on its merits. Appellant is entitled to the rebuttable presumption that Lee was of sound mind. The burden of proof was on plaintiffs to rebut the presumption. The rule is that sickness and old age do not in and of themselves

*Incapacity.*

constitute incapacity to transact the business of devising or conveying land. It is a mistake to suppose that old men and sick men are stripped by the law of their property right, to-wit, the *jus disponendi*. Another rule is that the opinion of a lay witness that a grantor or testator was of unsound mind is inseparably connected in probative force with the run of the facts and opportunities upon which the witness bases his opinion. The two go together. We do not mean to say that a non-expert witness must give all the minute details upon which he bases his opinion—that would be impossible and unnatural, but we do mean to say that his opinion is not worth while if separated from all facts of significance gleaned by personal observation. If those facts are connected, consistent, strong, and bear upon the issue, then the opinion of an intelligent lay witness has persuasiveness, cogency and weight—not otherwise. We have set forth the substance of the evidence and dismiss the matter by ruling that it does not show John Lee did not have contractual capacity at the time of the conveyance. It points the other way with emphasis. That he refused to convey to plaintiffs does not show it. No more does the fact that he changed his mind and conveyed to his daughter show it. The opinions of lay witnesses, absent facts to justify the opinions, do not show it. In short, the record is barren of proofs showing it. Hence, if the general finding of the issues in favor of plaintiffs covered incapacity, the decree was without substantial support in that particular.

(c) Nor can the decree stand on the foot of fraud. In the first place the general allegation of fraud in

**Fraud.** strictness might be held insufficient to support a decree based on fraud. A charge of fraud without specification, as a general rule, has been held a mere conclusion and worthless as a pleading of substantive fact. But waiving that view, in this case what the pleading left a mere conclusion, the

Lee v. Lee.

evidence left a mere delusion. There was no fraud, actual or constructive. Fraud being odious, the presumption is against it, hence, however difficult it is to be proved, it still must be proved before a court of conscience can set aside a deed on the theory of its existence. Fraud being infinite, chameleon-hued, protean-shaped, no court of equity has ever been so unwise as to give rope to fraud-doers by laying down a hard-and-fast definition of it, thereby enabling scamps to work at will outside the lines of the definition. To the contrary, fraud is left undefined except in the most flexible general way, so ·that it may meet the mould and pressure of the facts of the concrete case. But there can be no fraud of a grantee against a grantor in the sense of a court of equity unless there are "acts, omissions and concealments which involve a breach of legal or equitable duty, trust or confidence, justly reposed" and are injurious to the grantor or by which "an undue and unconscientious advantage is taken of" grantor. [1 Story's Eq. (13 Ed.), sec. 187; Howard v. Scott, 225 Mo. 1, c. 712.] Measured by that standard who could put his finger on the fraud of grantee, or upon fraud besmirching the hand (if any hand there was) instrumental in bringing her title?

(d) Neither can the decree stand on the foot of undue influence. The case is bare of such fiduciary relation as would raise a presumption of undue influence and would throw the burden on the grantee in the deed to sustain it. Not only so, but the existence of undue influence is not shown, let alone the exercise of it. Certainly the mere fact that the deed was made has no tendency in that direction, nor the fact that grantee was grantor's daughter, nor the fact that "love and affection" is set down as a causal factor. The case does not demand extended consideration in this particular. The facts are simple and few. An old father, sick, miserable, homeless (we use the word in its senti-

*Undue Influence.*

mental phase), owning a small tract of broken land in Missouri, finds his last resting place, this side the grave, with his daughter in Illinois. To all intents and purposes an outcast in the clutches of a dread and communicable disease, his idea had been that the law would give the land to the child with whom he died and who ministered to him at the close of his days. He concluded to make a conveyance to his daughter to anticipate what he thought the law itself should do. He contracts with the daughter for care and attendance during life. She promised it, the father conveyed and she performed. It is only by extreme grace that it might be inferred that this tract of land was the whole of his estate. But assume it was, its value was not disproportionate to the possible obligation, and we shall not write the law to be that he did not have the right to convey it to appellant under the sharp difficulties besetting him and the sharp cry of nature within him for human love and daughterly ministration. No respectable case can be found *contra* and we know of no rule of law impairing the conveyance on the score of undue influence where (as here) there is no satisfactory proof by direct or circumstantial evidence that undue influence was exercised. On this record, the thing was not done in a corner, this father knew what he was doing and wherefore, did what he wanted to do, as he wanted to do it, and what the law permitted him to do. Up to that time, without let, hindrance or question he had transacted all his business and looked out for himself with good sense. All the evidence worth while indicated he was capable of doing that. We sit to enforce fair and just contracts, not to abrogate them.

(e) The finding of the chancellor that the conveyance was without consideration was also palpably erroneous. There was a good consideration and a valuable consideration (hence a sufficient consideration) as those terms are defined in the books.

Consideration for Deed.

Speaking to the question of incapacity, undue influence, fraud and lack of consideration, we dismiss them one and all by stressing the singular fact that the two sons, plaintiffs here, shortly before deliberately planned to take the land by a grant from the father on the same consideration, care and support.   That effort is an implied admission on their part of propriety and validity, i. e., capacity to convey, sufficient consideration, absence of fraud, power of will to resist undue influence.   How comes it that a grant in their judgment valid then becomes invalid now with a mere change of name and sex in the grantee?   Blowing hot and blowing cold out of the same mouth does not commend itself in a court of conscience.

(f)   We now come to a phase of the case not to be passed without observation.   Respondents stand mute here and file no brief.   Why so?   The court was open.   The rules invited them. We sit to *hear* and then decide, whereby due process of law is accorded agreeable to the law of the land.   [Ex parte Nelson, 251 Mo. l. c. 103 et seq.]   In DePaige v. Douglas, 234 Mo. l. c. 81 et seq. (*q. v.*), we had occasion to comment on the unwisdom of that course.   On this record it is fair to surmise that the intentional failure to follow up their judgment and defend it from assaults (invited on the very face of the record by the weakness of the evidence adduced below, as presented in appellant's brief, duly served) was intended by respondents as a tacit admission that it could not be defended.   We may be in error in that surmise, but, as the case has already broken on the merits, it will do to say that the very fact such surmise springs in the court's mind points a moral that the observing may draw for themselves.   *Verbum sat sapienti.*

*Standing Mute on Appeal.*

The student curious to know the sources of our judgment in this, that or the other ruling may discern the harmonious doctrine of all the cases by consulting

Howard v. Scott, supra; Baldwin v. State, 12 Mo. 1. c. 235 et seq.; Southworth v. Southworth, 173 Mo. 1. c. 72 et seq.; Studybaker v. Cofield, 159 Mo. 596; Pennington v. Stanton, 125 Mo. 658; Anderson v. Gaines, 156 Mo. 664; Keithley v. Keithley, 85 Mo. 217; Hughes v. Rader, 183 Mo. 630; Black's Law Dict., tit. "Consideration;" Troll v. Spencer, 238 Mo. 1. c. 101 et seq.

The judgment is reversed and the cause remanded with directions to dismiss plaintiffs' bill. It is so ordered. All concur.