E. K. CLARK ET AL., Appellants, v. JENNIE CRANDALL ET AL.—5 S. W. (2d) 383.

Division One, March 3, 1928.

*J. H. Whitecotton, W. O. Jamison, Oliver W. Nolen* and *W. B. Fahy* for appellants.

90

*J. P. Boyd* and *Meriwether & Meriwether* for respondents.

GANTT, J.—Suit to contest the validity of the will of Susan E. Peirsol, which had been admitted to probate in Monroe County. She had no lineal descendants. Her brother, E. K. Clark, of Seymour, Iowa, and her nephew, Lucius R. Clark, of Chicago, are the contestants and her only heirs at law. The proponents are Jennie Crandall, Node Green and Node Green as executor of the will, both of whom reside in Monroe City. They are the sole beneficiaries under the will except the trustees of St. Jude's Cemetery, at Monroe City.

The petition charges testamentary incapacity and that testatrix was unduly influenced to execute the will by Node Green and Jennie Crandall.

Proponents for answer, after admitting certain allegations of the petition, state the testatrix was over twenty-one years old and of sound mind at the time she signed the will; that the will was duly executed and that said execution was her voluntary act free from undue influence of proponents or any other person; and, further pleading, asked for the probate of the will in solemn form. Both issues were submitted to the jury and they found the paper writing introduced in evidence as the will of testatrix to be her will, and from the judgment following contestants appealed.

The facts are as follows: In 1866 E. K. Clark and Jacob Peirsol purchased a farm in Ralls County, near Monroe City, and during said year moved there from Illinois. The family on the farm consisted of Jacob Peirsol, his wife, Susan, her brother, E. K. Clark, and the stepfather and mother of Susan and Clark. They lived on the farm five years, during which time the stepfather died. Clark, after the death of his stepfather, sold his interest in the farm to Jacob Peirsol and moved to Seymour, Iowa. The mother remained on the farm with her daughter for some time and then lived with her son in Iowa until her death. Peirsol and his wife lived alone on the farm until his death in 1912, all their children having died. He died testate leaving to his wife the farm, consisting of 400 acres, and the personal property. She also received $3500 life insurance money. Clark attended the funeral of Peirsol, and remained with his sister two months after the funeral. During this time 80 acres of the land were sold and the proceeds used to pay a mortgage on the farm. Later, the personal property was sold. Mrs. Peirsol moved to Monroe City before her brother returned to Iowa. She visited her brother in Seymour, Iowa, and during this visit he suggested that she make

her home there, and he offered to build for her a small house on his lot adjacent to his home. She stated that she preferred to live among her acquaintances in Monroe City, purchased a residence there and owned it at the time of her death. Their mother died at the home of Clark in 1888, leaving about $2000—$1300 to Clark and $600 to her grandson, Lucius. Nothing was left to Mrs. Peirsol, who felt she had not been fairly treated, and, to some extent, held this against her brother. Explaining the mother's will, the brother testified she claimed to have given his sister money when she was living with her in Missouri, and that the mother had furnished a part of the money to pay for the education of Lucius. Clark further testified that after the death of Peirsol the testatrix sent to him between $2500 and $3000 to loan for her; that shortly after she sent him the money she began to be uneasy about it and kept writing him until he collected and returned all the money except $708, which sum he claims he loaned to a man who afterwards became insane, which resulted in tying up his property so the money could not be collected. To satisfy his sister he gave his personal note for $708, and it seems to be admitted that he paid the interest regularly on this note up to the time of his sister's death. Proponents claim she sent to him at different times sums amounting to $4480. The brother and sister corresponded regularly during the years after her husband's death, and he visited her many times at her invitation. Many of the letters were in evidence tending to show a good feeling between them and the condition of her mind at the time. Prior to January, 1921, her letters indicated a normal mind; thereafter they tended to show strongly a gradual weakening of her mind. Witnesses for contestants gave evidence tending to show testatrix was of unsound mind, and witnesses for proponents gave evidence to the contrary. Other facts will be noted.

At the outset we are confronted with the contention of proponents that contestants' petition does not state a cause of action on the issue of undue influence or confidential relations. A similar contention was considered in the case of Ehrlich v. Mittelberg, 299 Mo. 284, l. c. 300, 252 S. W. 621, where it was said:

"The above testimony of the scrivener, Dr. Wolter and Mary Ehrlich went in without objection. The sufficiency of the petition was not challenged by motion, demurrer or otherwise. The case was tried upon the theory, up to the return of the verdict, that the petition stated a cause of action, and the evidence aforesaid was admitted thereunder without objection. Under the circumstances aforesaid, the appellant is in no position, after verdict, to attack the petition on the ground that it contained simply legal conclusions, etc. [Sec. 1550, R. S. 1919; Simpson v. Wells, 237 S. W. (Mo.) 526, and cases

cited; Machinery Co. v. Bottling Co., 273 Mo. l. c. 149, 200 S. W. 1079; Tebeau v. Ridge, 261 Mo. l. c. 559, 170 S. W. 871; Winn v. Railroad, 245 Mo. l. c. 412, 151 S. W. 98; Lange v. A. B. B. Assn., 241 S. W. (Mo.) l. c. 456.]"

In the instant case the proponents made no objection to the sufficiency of the petition by motion, demurrer or otherwise, answered by denying the existence of undue influence and fiduciary relations, did not object to the introduction of the testimony offered by contestants on either issue; and said issues were submitted to the jury in instructions tendered by both contestants and proponents.

Proponents direct our attention to the case of Lee v. Lee, 258 Mo. 599, 167 S. W. 1030. In that case a bill in equity was criticized, and designated as a "loose and impoverished bill," but the sufficiency of the petition was not questioned in the trial court or in this court, and the case on review was ruled on the merits. This case having been tried as if the petition tendered said issues, the contention is overruled.

We come now to consider the contentions of contestants.

I. It is insisted that the will was not legally executed. The contention rests on the fact that the witnesses did not remember whether they attested the will at the request of testatrix or of Senator McClintic, who drew the will. He testified testatrix stated to the attesting witnesses the document was her last will and she requested them to sign as witnesses. He further testified she signed the paper in the presence of the attesting witnesses and all signed in the presence of each other. The attesting witnesses testified to the same effect, except as to who asked them to attest the will. The testatrix knew these men came for that purpose; and if Senator McClintic, in the presence of testatrix, requested them to attest the will, this amounted to a request by testatrix. [Lohmann v. Lohmann, 216 S. W. 518.] The contention is overruled.

II. While residing in Monroe City testatrix's business was limited to loaning money, the care of her home and the purchase of food, fuel and clothing for herself. There is no direct evidence of undue influence. The evidence for contestants tends to show Green attended to the loaning of her money for years, and, at her suggestion, had been validating her checks for about two years before her death, except the small checks given to merchants for supplies for the home. The evidence further tends to show that Mrs. Crandall, in October, 1921, was employed by Clark to take care of his sister at a wage of $15 per week. This

she did in the home of testatrix until December 6, 1923, when Clark, while on a visit to Monroe City, arranged for his sister's care in the home of Mrs. Crandall, where she remained under Mrs. Crandall's care until she was taken to the Insane Asylum at Fulton, in March, 1923, where she died in September, 1923, at the age of eighty-three years of hardening of the arteries. At the time of her death she was possessed of personal property amounting to about $11,000, and her home in Monroe City of the value of $2000. Proponents were not called as witnesses and introduced no testimony on either the issue of fiduciary relations or undue influence. It is the contention of contestants that the evidence introduced by them tended to strongly show that a fiduciary relation existed between testatrix and proponents, and, absent rebutting testimony, a presumption of law arises in their favor on the issue of undue influence, and the court should have instructed the jury to return a verdict setting aside the will. The failure of proponents to introduce testimony on these issues did not authorize the court to hold as a matter of law the will was procured by undue influence. In this situation the jury must first determine from the testimony introduced by contestants if a fiduciary relationship existed. They might not believe the evidence for the contestants on this issue. If they believed it, they might find it insufficient to establish the relationship. If they believed the relationship existed, the presumption of undue influence arises and the burden of evidence on this issue shifts to proponents. [Downs v. Horton, 287 Mo. 414, l. c. 431, 230 S. W. 103.] The jury might find from the evidence for contestants that proponents did not take advantage of the relationship.

Contestants direct our attention to the case of Mowry v. Norman, 204 Mo. 173, l. c. 191, 103 S. W. 15. In that case the testimony introduced by contestants raised the presumption of undue influence, and proponents offered "rebutting testimony." It was ruled as follows: "This presumption must be rebutted by testimony, and the credibility of that rebutting testimony is for the jury and not for the court." In so holding the learned judge was applying the rule to the facts of that case. By that statement he did not mean if the proponents failed to offer "rebutting testimony" the court should rule as a matter of law that absent "rebutting testimony" by proponents the court should instruct the jury to return a verdict setting aside the will. This is made clear by the fact he cited the case of Gannon v. Laclede Gas Light Co., 145 Mo. 502, 46 S. W. 968, 47 S. W. 907. That case rules this contention against contestants.

III. Contestants contend the court was in error in admitting in evidence the statements of the testatrix as to the distribution of her mother's estate. This evidence was admissible as tending to show her feelings toward her brother, E. K. Clark. [Frohman v. Lowenstein, 303 Mo. 1. c. 361, 260 S. W. 460; Page on Wills, sec. 748.] However, the testimony was first brought out by contestants' direct examination of E. K. Clark. He was cross-examined by proponents, and the contestants made no objection or motion to strike out the evidence. Mrs. Eddy testified, without objection, to statements made by testatrix as to the distribution of the mother's estate. Absent objections, the contention is overruled.

IV. Contestants contend the court was in error in permitting non-expert witnesses to give their opinion as to the condition of the mind of testatrix without detailing facts upon which to base an opinion. An examination of the record discloses that both contestants and proponents were guilty of a violation of this rule in the examination of witnesses. Contestants by their conduct invited the court to admit in evidence this testimony and will not now be heard to urge it as error. [Wiggington v. Ruhl, 275 Mo. 1. c. 448, 205 S. W. 168.]

V. Contestants contend the court was in error in refusing to admit in evidence letters written by Node Green to E. K. Clark and Alice Clark, and letters by Mrs. Crandall to Alice Clark, daughter of E. K. Clark, with whom Alice resided. The letters were offered as admissions against interest on the issues of testamentary incapacity and undue influence.

Proponents contend the letters were not competent and direct our attention to the rule that an admission of testamentary incapacity or undue influence made by a devisee or legatee cannot be given in evidence against another devisee or legatee. This is an exception to the general rule allowing the admissions against interest of a party to be shown. The reason for the exception is that while there is among devisees or legatees a community of interest in sustaining the will, yet their interests in the estate are separate and not joint. Each claims independently of the other, though under a common instrument, and it is said it would be unjust to bind one beneficiary by the prejudicial admissions of another. Such being the basic nature of the doctrine, it very naturally follows that if a conspiracy among the proponent devisees or legatees be pleaded and proven, or if the admission is made by the only devisee or legatee to be adversely affected by the overturning of the will, the exception does not apply.

[Schierbaum v. Schemme, 157 Mo. l. c. 17, 57 S. W. 526; Teckenbrock v. McLaughlin, 209 Mo. 541, 108 S. W. 46.] With this understanding of the governing principle, we set forth some of the letters tendered, as follows:

Monroe City, Mo., Oct. 20, 1921.

Mr. E. K. Clark,
Seymour, Iowa.

Dear Sir:

Mrs. Piersol is in mighty bad shape, at times her mind is a complete blank and she is starving herself to death, and she imagines that people are breaking into the house every night. She was very bad yesterday. She went to Mrs. Crandall looking for her mother and her dead brother, also looking for Jacob. She told Mrs. Crandall that they had left here and she was looking for them. I was away yesterday and she wanted me very bad, so when I came home I went in and asked her what she wanted, and she had forgotten, but wanted to know when had heard from you, and asked me to write to you and tell you that she wanted to know when you come and see her, but she said don't tell him I am sick. I told her that I would tell you to come down and bring something good to eat, and I never see her have such a hearty laugh and I told her some ridiculous thing and she seemed to be feeling fine, so if its possible for you to come, I would say come. It it wasn't for Mrs. Crandall I don't know what I would do and I think that she should be well paid as she is poor and makes her living by sewing, if you come let me know what train you will come on so I can tell her, but don't fool us as if she would be disappointed I don't know what might happen.

Resp. Node Green.

Monroe City, Mo., Oct. 22, 1921.

Dear Allie:

In reply to your Aunt's condition it is sad indeed. I never saw a case just like hers, she is not sick one bit, but cannot remember anything as long as it takes me to tell her. I thought you could tell more about her condition from her letters she had been writing Mr. Clark than anything I could say, so I have just been hoping he would come down and see for himself. She told me she asked him to come in those last two letters she wrote and I knew she wrote for Daily mailed them and she is looking for him and wonders every day why he does not come. I stay nights with her, have for the last 4 or 5 weeks. She is no worse than she has been, or but very little if any, but she says she can't stay alone any more, so I believe Mr. Clark had better come next week if he is able and maybe some arrangement can be made for her.

Respectfully, Mrs. Crandall.

Monroe City, Mo., Dec. 27-21.

Dear Allie:

I tryed to find time to write you before Xmas but that brings extra duties you know, and Mrs. Piersol has been extremely nervous the last two weeks so my time has been all taken up. I do not sew at all any more, only just a little to have an excuse to stay home a little during the day for I cannot stay there all the time. Until the last three or four weeks she seemed satisfied at night when I was with her, and I have stayed every night but one since Mr. Clark left and that one I was sick. Now she has me up all hours in the night looking for men. She says they slip around on her side of the bed, roll her over and look under her for money, and when I get up, turn on light and look

all over the house, I still cannot convince her there is nobody there. I use to sympathize with old people now my sympathy is for the one who cares for them, but I am trying to do my work well, and when I can't stand it no longer I am going to quit.

Tell Mr. Clark Daily got his job in office wishing you a prosperous and happy new year I am your friend,

Mrs. Crandall.

---

Monroe City, Missouri, January 3, 1922.

Miss Alice Clark,
    Seymour, Iowa.

In reply to your letter of recent date regarding Mrs. S. E. Peirsol's business will say that she is not in condition now to give a power of Atty, it would not stand. What should be done she should have a guardian appointed to look after her business and there is no one to do this but your father and he told me he did not care to act, as she would have to be taken before the County Court, and I doubt if we could get her there.

The only thing to do that I know of is to continue as I have in the past, and then if she should get to the point where she would have to be taken away then your father would have to act.

Very truly, Node Green.

I have not had a settlement with her since 1919 and I would like very much to have my money as I could use it, but under the circumstances, I will have to wait.

---

March 20-22.

Dear Allie: Will try to answer your letter would have written sooner but we have all had the flu but are better now. Lucile was a very sick girl for two days, she was lots worse than Daily, and I did not have time to stop but one day and two nights. I took at night at your Aunts I was sure she would take it but she has not took it yet. I only stay home one night I spent lots of time on the street between my house and hers, Miss Lee has moved out of her house and she is alone I tryed to get her to come stay with me but she will not do it and says she will take her own life before she will stay alone, so I had to go. I do not believe she would do it but was afraid to risk it. I wish your father could come down and stay with her a while she seems to want some of her people so bad. She keeps the house so close and hot I can hardly live at all, and she will not let me sleep in north room, but must sleep with her. I think she gets thinner all the time and she says she is cold all the time, and I am so hot I nearly die and fresh air is a luxury.

With love, Mrs. Crandall.

---

Monroe City, Mo., March 30, 1922.

Mr. E. K. Clark,
    Seymour, Iowa.

Dear Sir: I have your letter also check and I have given you credit on the note for the interest and am also enclosing Mrs. Piersols receipt for the Int so that you are double sure that you have credit besides the Check as another receipt.

She is still having all kinds of imaginary troubles and some times she almost puts me to my wits ends and Mrs. Crandell is beginning to kick as she is almost tired out, its a job and a big one. I think that something must be done as she is getting almost past doing anything, and to day she asked me how to spell her name, and if she gets much

worse I do not see how I can handle her business, as I have no authority to sign checks or any thing else for her.

She has no one in the house with her and she told Mrs. Crandell a short time ago rather than stay alone she would kill herself, so she might do it, I really think it would be wise for you to come here and do something I have been quite sick abit this winter was away for 3 weeks and am feeling some better but a long ways from being well. I could handle this business much better if I had authority to act and it would be much easier on me, the 1st of May she will then owe me for 3 years services, and I need the money, and unless something is done by that time so it will make it easier on me. I will be compelled to give it up. I would like to hear from you, I suppose that Mrs. Crandell has told you her condition and has kept you posted. Awful wet here, and no farming done the Drs. are busy men here lots of flue and lung trouble and many deaths.

Hoping that you and your wife are better, I am yours truly,

Node Green.

---

Monroe City, Missouri, April 7th, 1922.

Mr. E. K. Clark,
Seymour, Iowa.

Dear Sir:

I am writing you regarding Mrs. Piersols condition, as she has about gotten me to the jumping off place, and I am a loss to know what to do, Mrs. Crandell was telling me that if she continued that she was afraid that she would be unable to handle her, as she was getting to dispute her word and that she would not believe her at times and times that she runs off and she says that she is getting blood thirsty.

She runs off at times and we have quite a time finding her, at times she says she is going to her people as she wants to see them, and she will start out to find her mother and Mr. Peirsol, and what is bothering her now she thinks that you come down here every night and take things from her, she says she just can't keep any soap for Eaton and if she would see you takin it that she would try to stop you. For the past week her mind has been on you getting into the house.

She hides her soap in the bed tick and at one time she got all her jewelry and put it on and went down town, but she has taken it all off now but two rings and she still holds to that, I have the balance in the bank.

I have talked to an atty and he says that you can make a complaint if you was here as to her sanity and sign an affidavit and have her adjudged insane, and then the court would appoint a guardian for her or if the neighbors would complain that they could have two Drs to have her adjudged insane, so this is about the only way we can do this, I have talked to her many times to give her consent to have some one appointed but she has always turned me down stating that we was getting a long all right. Mrs. Crandell tells me that she has implicit confidence in me and does not want any one to attend to her business but me, but it has come to the point where I am unable to act with out authority, I cant sign checks and papers for her also release them for her. So you can see where it is drifting to.

"I asked her today if I could get an other old lady here in town about her age that would come and stay with her, and help to do her work and be there all the time if she wouldn't like it and she said yes that she would have some one to talk to then and wouldn't get so loansome, but she said the other old lady would have to furnish her part of what they had to eat, she does not want to spend a cent. And I have a time some time when I pay her light bill or pay her coal bill. So I thought that I had better write you and see what you thought was the best thing to do. I wish that you could come down here, I think we could

handle her together, she takes a butcher knife and sticks rags under the door and around the windows so that the devels as she calls them cant get in, and now she wants me to get some one to come and sit up and watch them. I think if some one was with her all the time and keep her mind employed she would be better, but as it is she is getting worse all the time. And something must be done, its a very sad thing when you think of it. So I would appreciate it if you will write me and tell me what you think is the best, she wanted me to go after you last week, she has an awful spell, but all she has said about you since was that you came down every night and took her soap and that she could not get to see you. I have given the facts just as near as I can, so let me know what is best. She has a time threatening to kill herself, and says she would if it wasn't for leaving Jacob and the girls.

Very truly, Node Green."

All of the letters from the testatrix to her brother in Seymour, Iowa, offered by contestants were admitted in evidence. The following is one of said letters:

Monroe City, Mo., Dec. 20, 1921.

Dear my brother wlfk I have try to keep themhs I have tried to you but the thing is try too to write that ways thing you soon to gone we will have a good time to lonlg time It is bell the time why you c ome It is a pley to come here. The old knowd the time when are your W Tecli whe why the some sore I think he got mine the thing I am thas thing are sunch you will the old thale the the has gone so we are have a time wish you yous a scarre I will be to come sood write when you come soon lots of have a lot of you so I can you I hope wite come This is the first any soon come here we wan to her soon.

Eaton when you are come comming sood them you come I wish like he come I the the lot to you was come soon he got a let met if you can so gruich I am have to read you will or come come soon I am afraid come now I afraid it is for a time you do not to time come soon the cat is near time I do not you any sood may be better better next time come soon I am a hard a time to the time I am all that soon come come soon. love to all sister.

If both beneficiaries had signed all the letters written by each of them to Clark and his daughter, it would not be contended they were inadmissible, absent other interests prejudicially affected. They fall short of that because three are written by one beneficiary and three by the other, and there is nothing to show either authorized the writing of the letters signed by the other; but all the letters are of about the same date and tend to disclose the same ultimate fact, or alleged fact—testamentary incapacity of the testatrix—and all refer to her condition at about the same time, shortly preceding the execution of the will on May 2, 1922. In these circumstances what sound reason was there for excluding them—assuming there were no other interests to be taken into account, a question which we will discuss later?

By urging the objection each beneficiary complains of the *injustice* which would result from visiting on him the consequences and effects of prejudicial admissions made by the other, when he, himself, was

saying—admitting—the selfsame thing about the same time. We think the exception to the general rule ought not to apply to such a case. The object of a judicial inquiry is to determine the truth, and it would be an injustice to contestants rather than to respondents to suppress a fact attested by every party who would be detrimentally affected by its disclosure.

This brings us to the next question. By the remaining bequest the trustees of St. Jude's Cemetery are given $100, the income of which is directed to be used for the care of testatrix' lot in said cemetery. The trustees have made no admissions tending to show testamentary incapacity or undue influence. In this situation is this bequest such as to sweep away the premise on which the above conclusion is based? The bequest creates a private and not a charitable or public trust. The trustees and the public have no beneficial interest in the fund within the meaning or the exception to the general rule, that admissions of one legatee cannot be admitted in evidence against other legatees. [21 R. C. L. sec. 47, p. 316.] Absent such interest neither the trustees nor the public can be harmed by the admission in evidence of the letters written by the other legatees. Absent a statute, a bequest for the perpetual care of a burial lot in a cemetery is void as a perpetuity. [21 R. C. L. 316, sec. 47; 5 R. C. L. 335, sec. 64.] Such was the rule in this State until the enactment of a statute in the Laws of 1919, page 181, now Section 1094, Revised Statutes 1919. While the trustees have no beneficial interest under the will, they are legatees of a valid bequest and necessary parties to the suit. They were not made defendants and do not appear in this action. They should have been made parties to the suit; and if the cemetery is a corporation or association capable of being sued, it might have been made a party to the suit. In Wells v. Wells, 144 Mo. 198, 45 S. W. 1095, we reversed and remanded the cause for the reason all the legatees under the will were not in court.

The letters of Green and Mrs. Crandall above set forth should have been admitted in evidence. The court properly excluded the other letters written by Green to Clark, for the reason they were not written during the period of time letters were written by Mrs. Crandall to Alice Clark.

For the error noted the judgment is reversed and the cause remanded. All concur, except *Ragland, J.,* not sitting.