Rollo L. TOWNSLEY and Helen M. Townsley, Appellants,

v.

Erroll THIELECKE, Georgia Mailloux and Kenneth Yost, Respondents.

No. 48358.

Supreme Court of Missouri,

Division No. 2.

Sept. 11, 1961.

Motion for Rehearing or for Transfer to Court en Banc Denied Oct. 9, 1961.

H. Jackson Daniel, Martin Schiff, Jr., Husch, Eppenberger, Donohue, Elson & Jones, St. Louis, for appellants.

Jackson F. Adams, Clayton, for respondent.

BARRETT, Commissioner.

This action in four counts is said to be a suit "in equity and at law to recover for plaintiffs the surplus funds of a foreclosure sale of real property formerly owned by them." Or alternatively, "Plaintiffs' suit is grounded in contract and in fraud, either to enforce what they claim was the true consideration for the quitclaim deed they executed, or to set the deed aside on alleged grounds of fraud and have a constructive trust or equitable lien declared in their favor." The trial court found that plaintiffs were not entitled to either legal or equitable relief and the plaintiffs have appealed from the judgment in favor of the defendants.

In September 1954, the plaintiffs, Rollo and Helen Townsley, purchased the property in Bellefontaine Neighbors known as 9505–9517 Bellefontaine Road, they say for the price of $22,500. The improvements then on the two lots, one 60 x 152 feet and the other 133.44 x 152 feet, were described in the exchange contract as a four-room frame bungalow and a "frame Tavern Building." Their purchase of the property was accomplished in this manner: The Townsleys transferred their equity in property at 7061 Eichelberger to Jewell Reagan and Jewell transferred the Bellefontaine Road property to them, subject, however, to the ability of the Townsleys to obtain a new first deed of trust securing the principal sum of $10,500 and subject to a second deed of trust executed by the Townsleys to Jewell Reagan securing a note in the sum of $7,000. It may be noted in passing that these figures, $22,500 purchase price and two deeds of trust securing an indebtedness of $17,500, indicate a down payment or an equity of the value of $5,000. The Townsleys were successful in borrowing $10,500 from the Northwestern Savings & Loan Association and this indebtedness was secured by a first deed of trust providing for monthly payments of $102.47 beginning on October 1, 1954. The second deed of trust to Jewell Reagan, the $7,000 indebtedness, provided for monthly payments of $87.54 beginning on December 15, 1954.

In November 1954, the defendant, Erroll Thielecke, acquired the $7,000 note and the second deed of trust from Jewell Reagan by having transferred to her the equity in a piece of property on Copelin and Louisiana Avenues. The title to this transferred property was in Georgia Mailloux, Thielecke's mother, a woman in her eighties and said to be a resident of Michigan. She is the second party defendant in this action. According to Thielecke, his mother's financial interest in the $7,000 note was $4,800 and his personal interest was $2,200.

For a time the Townsleys lived in the small bungalow and for two months attempted to operate a restaurant in the larger frame building. They claim to have had offers from two oil companies to buy the property for $29,000 but these offers were contingent upon the property's being rezoned to commercial use and that was not possible. In 1956 the Townsleys rented the property to the City of Bellefontaine Neighbors as a city hall and on January 25, 1957, entered into a sales contract in which the city agreed to purchase the property for the sum of $24,950. This deal was not consummated, the Townsleys say because the then mayor refused to sign the check. The city forfeited the earnest

money, $275, and the Townsleys sued the city for breach of contract. By February 20, 1957, the Townsleys moved out of the property. In any event, by May 1957 the Townsleys were in arrears in their payments on the note secured by the first deed of trust and, admittedly, had made no payments on the $7,000 note secured by the second deed of trust.

The Townsleys had become friendly with Thielecke and, according to them, he always said not to worry about the second deed of trust, the main thing was to take care of the payments on the first. Nevertheless, about the time the contract with the city "fell through," Townsley said, "We did talk about foreclosure." But on April 10, 1957, the Townsleys, at Thielecke's request, executed a quitclaim deed to the property for $20, paid by Thielecke from funds which he said belonged to his mother. The grantee in that deed was "G. Mailloux," Thielecke's mother—the plaintiffs thought she was a straw party. Contemporaneously they executed a receipt for $20 to "E. Thielecke Agent." The receipt recited that the $20 was in full consideration for the quitclaim deed conveying all their interest in the Bellefontaine property. The deed was recorded on April 12, 1957. Incidentally, defendants' counsel refer to these two documents, the deed and the receipt, as "the written agreements" of the parties. The plaintiffs say that when they gave Thielecke the quitclaim deed he told them that he had money and was in a better position to handle the property, that he "would in turn dispose of the property" and after the payment of the first and second deeds of trust (this is the language the parties use) he would "see that we got our share," or, "the balance whatever it sold for would go to my wife and myself." Or as Mrs. Townsley put it, Thielecke said that the quitclaim deed was a mere formality—"that it had to be—that he proved he was starting proceedings." Then she says that Thielecke promised "when he sold the property," or, "when the foreclosure was all over" and the first and second deeds of trust were

"cleared up, all the expenses, we would definitely get the surplus of the remainder of the money."

Thielecke says that when he took the quitclaim deed from the Townsleys he had no intention of foreclosing the second deed of trust even though he had told them that if the deal with the city did not go through he would have to foreclose. He emphatically denies that he made any of the promises testified to by the Townsleys. His explanation of his taking the quitclaim deed was this: "Well, they had been in possession of the property for about thirty-two or three months and there was approximately a thousand dollars worth of delinquent payments under his first deed of trust and he used up all of the slack that he could under his first mortgage and I had kept him afloat as long as I possibly could, and all things have to come to an end." When asked whether he had told the Townsleys, or left the impression with them, that a quitclaim deed and a foreclosure were one and the same he said, "Simplified way of same results," or, "It was a short way to get the troublesome piece of property behind us." In addition, he knew from his experience as a professional dealer in real estate that the Townsleys would not share in any surplus upon foreclosure " because they had already conveyed the property." As indicated, however, when he took the quitclaim deed he did not then intend to foreclose the second deed of trust.

When he went to the courthouse to record the deed he discovered that there were judgments against the Townsleys, one for $558.99, one for $417.80, another for materials used in this property in the sum of $345.29, and a notice of federal tax liens in the sum of $171.16. It was then that he decided to foreclose the second deed of trust and on April 12, 1957, a day or two after receiving the quitclaim deed, caused the first notice of trustee's sale to be published. On May 6, 1957, the successor trustee Yost (the third defendant in this action) conducted the sale. At the sale there were three or four bidders and finally

a person unknown to any of the parties bid $29,000. Thielecke bid $29,001. Yost took the note and deed of trust and had them canceled. Thielecke had caused the trustee's deed to be prepared and Yost executed it. The grantee in this instrument was William C. Uphoff, a straw party, an elderly man without a known place of abode. Thielecke paid the costs of the trustee's sale and the fees due the trustee but he did not pay over to the trustee any part of the $29,001 bid. Yost says that Thielecke had a large check "made to this woman, but he also had a letter from her and then at that time a deed or something to show he was representing her," and he explained that it was foolish to make the check to the woman when he was representing her and "he was now the owner anyway of the whole interest that was involved at that time." Subsequently, through a power of attorney from Uphoff, Thielecke negotiated a new lease of the property to the City of Bellefontaine Neighbors. On June 21, 1957, Thielecke took a quitclaim deed (the plaintiffs call it "a pocket quitclaim") to the property from Uphoff to his mother, Georgia Mailloux, and this instrument was recorded on July 3, 1958. In 1959 the buildings on the property burned and the proceeds of the fire insurance, $6,750, were applied on the $7,711.94 indebtedness then due under the first deed of trust.

In these generally noted circumstances, on February 20, 1959, a year and eight months after the foreclosure, the Townsleys instituted this action. This summary of the theory of the action and the purpose of the four counts of the petition is taken from the plaintiffs' brief: "Plaintiffs seek to enforce what they claim was the true consideration for the quitclaim deed they executed at Thielecke's instance, or in the alternative, to have the deed set aside as conceived in fraud and a constructive trust or an equitable lien declared in their favor. Count I is a suit on a contract, to enforce Thielecke's oral promise to plaintiffs to pay over to them the proceeds of the fore-

closure sale, less selling expenses and less the value of the second deed of trust. Count II is a common-law action for deceit, requesting the same relief as is sought in Count I, plus punitive damages. Count III seeks equitable relief, by praying the court to rescind the quitclaim deed and to find and declare that G. Mailloux holds the aforesaid premises in constructive trust for the plaintiffs to the extent of their mortgagors' interest therein. Count IV also seeks equitable relief, requesting the court to set aside the quitclaim deed and to declare and enforce for plaintiffs' benefit the vendor's lien possessed by Yost, successor trustee. No money judgment is sought against Yost."

There were no specific findings of fact as to each count, in its judgment the court found and held "that plaintiffs' evidence is not clear, cogent, positive or convincing, and therefore plaintiffs have not sustained their burden for equitable and/or legal relief, and finds the issues herein joined in favor of the defendants and against the plaintiffs * * *." The plaintiffs claim that by this finding the court erred in imposing upon them the burden of proving their case by clear, cogent and convincing evidence because they say that under the law they were entitled to an award of damages merely by proving their case by the preponderance or greater weight of the evidence. This argument is particularly addressed to Count II of their petition which is said to be a common-law action for damages on grounds of fraud and so they contend that their cause was not "evaluated and judged by the proper legal standards." This argument is also advanced in part against the court's findings on the equitable counts, although they contend that this court should find the facts and draw the inferences to support all their claims. In this connection and as a matter of practice and procedure, the plaintiffs make the further point that the court erred in excluding relevant, competent and material evidence regarding the oral contract pleaded in Count I to enforce Thielecke's

promise to pay over the surplus proceeds of the foreclosure sale.

■ In view of these arguments it is necessary to again note and repeat, unfortunately, the rules governing appeals in equity and court tried cases. As to the equity counts, the cause is tried anew, the court ultimately entering such judgment "as such (trial) court ought to have given, as to the appellate court shall seem agreeable to law." Sup.Ct.Rule 83.13(c), V.A.M.R. This court may make its own findings as to the facts if the weight of the evidence is manifestly against the decree of the trial court. Allison v. Mildred, Mo., 307 S.W.2d 447, 453; Meyer v. Schaub, 364 Mo. 711, 266 S.W.2d 620. In all cases tried upon the facts without a jury "The appellate court shall review the case upon both the law and the evidence as in suits of an equitable nature. The judgment shall not be set aside unless clearly erroneous, *and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses.* The appellate court shall consider any evidence which was rejected by the trial court and duly preserved for the appeal when the appellate court believes such evidence to be admissible." (Italics supplied.) Sup.Ct. Rule 73.01(d). It should not be necessary to again point out that it is very difficult, if not impossible, in an appeal in an equity suit, or even a court tried case, to predicate error, in its conventional sense, upon the court's findings of fact, conclusions of law or in the admission or rejection of evidence. Lee v. Lee, 258 Mo. 599, 167 S.W. 1030; Cox v. Bryant, Mo., 347 S.W.2d 861.

■ The judgment in this case is based upon the trial court's finding or persuasion, impliedly if not directly, as to the credibility of the plaintiffs' evidence,—it "is not clear, cogent, positive or convincing." And as between these parties in this particular case it is appropriate, after careful review of the entire record, that this court defer to all findings and inferences necessarily based or dependent upon the credibility of conflicting oral evidence. Collins v. Shive, Mo., 261 S.W.2d 58, 64; Basman v. Frank, Mo., 250 S.W.2d 989, 992; Wilber v. Wilber, Mo., 312 S.W.2d 86, 90. It is not necessary to again refer to the evidence specifically and point out the particular issues resolved by thus deferring to the trial court. It is sufficient to note by way of illustration that it disposes of the plaintiffs' essential claim of an oral promise by Thielecke to pay over any surplus after foreclosure and any other asserted oral agreements. Mulrooney v. Irish-American Savings & Building Ass'n, 249 Mo. 629, 155 S.W. 804; annotation 154 A.L.R. 385. In this posture, with these findings of fact, the case is to be contrasted to those in which the trial courts, in the circumstances, found the oral agreements and this court in reviewing the cases determined only that the decrees were supported. Johnson v. Blase, Mo., 322 S.W.2d 759; O'Day v. Annex Realty Co., Mo., 191 S.W. 41.

The plaintiffs point to the unnecessarily devious manner in which Thielecke obviously handled his transactions in general and urges that the fact establishes the fraudulent character of the quitclaim deed. They point to the false statements he is alleged to have made to them, to Yost and to others, that he was a lawyer or had studied law, that the law required building and loan companies to foreclose mortgages after six months' delinquency, that he was compelled to buy a quitclaim deed or foreclose, and to other matters said to be representations and insists that they together with the obviously inadequate consideration of $20 demonstrate the fraudulent character of the deed, entitling them to either have the deed set aside or a trust imposed. The credibility of these asserted representations aside, some of the statements were not made to the plaintiffs and even if they had been it is difficult to understand how they influenced the plaintiffs' actions or how they could possibly bear upon the execution of the deed, the foreclosure or upon any of the essential issues involved here. The plain-

tiffs were not novices in exchanging property and the execution of notes and deeds of trust, and whatever Thielecke may have represented they well knew that they had made no payments on the $7,000 note secured by the second deed of trust and except for his oral or tacit forebearance that it was subject to foreclosure any time. The plaintiffs claimed that they were not as far behind in their payments on the $10,500 note and first deed of trust as others said and yet they were behind and admittedly made no payments after they moved out of the property on February 20, 1957, because, as Mr. Townsley said, they had no money to pay on either obligation. Or, as Mrs. Townsley said, "Towards the end" they were financially unable to keep the property.

■■ They contend that Thielecke often visited them socially, and he did advise them about the value and purchase of other property, but in their relationship of mortgagors and mortgagee there was no confidential relationship. Sewell v. Ladd, Mo. App., 158 S.W.2d 752, 757; Bogert, Trusts, 2nd Ed., Sec. 482, pp. 151–152. Assuming that twenty dollars was inadequate, that fact alone would not entitle the plaintiffs to have the quitclaim deed set aside, inadequacy of consideration is a factor to be considered (Meyer v. Schaub, supra) but there must also be present fraud or some other compelling circumstance in addition to mere inadequacy of consideration. Binnion v. Clark, 359 Mo. 202, 221 S.W.2d 214; Robinson v. Field, 342 Mo. 778, 117 S.W.2d 308. In their briefs it is asserted that the effect of the court's decree is to divest the plaintiffs of a "residual property interest worth approximately $20,000.00 on the open market," presumably at the time of the foreclosure. But there is no evidence that any "residual" interest the plaintiffs ever had was of the value of $20,000. It may be that Thielecke's $29,001 bid at the trustee's sale is some criterion of the property's value (59 C.J.S. Mortgages § 596(b), p. 1034) but that does not establish a

"residual" value in the plaintiffs of $20,000. In the first count of their petition damages in the sum of $20,261.26 are prayed but this computation ignores any sum due on the $10,500 note and first deed of trust. The judgments and liens against plaintiffs aside, their admitted indebtedness on the two notes was $17,908.42 when the second deed of trust was foreclosed and under its terms all these items were payable ahead of any "residual" interest. And incidentally, while the plaintiffs insist that this court, in addition to other losses, should award substantial punitive damages, they fail to indicate how or by what authority such an award could be made.

Before concluding there should be the caveat that this particular case is determined solely upon the theory on which the parties have tried and presented it. And the essence of the plaintiffs' claim is twofold: first, the alleged oral promise of Thielecke, said to be the true consideration for the quitclaim deed, to pay over to the plaintiffs the proceeds or surplus of the foreclosure sale; second and alternatively, "to rescind" or set aside the quitclaim deed as the foundation for a constructive trust or, as plaintiffs say, a vendor's lien. As indicated, these essential issues have been determined against the plaintiffs. This is not a suit under the terms of the deed of trust and the applicable statutes to redeem the property or to set aside the foreclosure and the trustee's deed. V.A.M.S., Secs. 443.410, 443.420; Euclid Terrace Corp. v. Golterman Enterprises, Inc., Mo.App., 327 S.W.2d 542; Jackson v. Klein, Mo., 320 S.W.2d 553; Starr v. Mitchell, 361 Mo. 908, 237 S.W.2d 123. And it should be further noted by way of discrimination that it is not the theory of the parties to this suit that the quitclaim deed was in fact a mortgage or, if not set aside for fraud, that it did not extinguish any equity of redemption independently of the deed of trust. See particularly the annotation 129 A.L.R. 1435, and Wilson v. Vanstone, 112 Mo. 315, 20 S.W. 612; Bailey v. St. Louis Union Trust Co., 188 Mo. 483, 87 S.W. 1003; Hutchings

v. Terrace City Realty & Securities Co., Mo., 175 S.W. 905.

For the reasons indicated the judgment is affirmed.

BOHLING and STOCKARD, CC., concur.

PER CURIAM.

The foregoing opinion by BARRETT, C., is adopted as the opinion of the Court.

All concur.